OPINION
JANICE M. HOLDER, J.,
delivered the opinion of the court,
in which PANEL: FRANK F. DROWOTA, III, C.J, and E. RILEY ANDERSON and WILLIAM M. BARKER, JJ., joined.
The appeal in this capital case arises from the resentencing of Richard Hale Austin, who originally was convicted and sentenced to death in 1977 as an accessory before the fact in the premeditated murder of Julian Watkins. This Court affirmed the conviction and sentence. See State v. Austin, 618 S.W.2d 738 (Tenn.1981), cert. denied, 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981). In 1997 the Sixth Circuit Court of Appeals granted habeas corpus relief as to Austin’s sentence, holding that counsel was ineffective at the penalty phase of the original trial. See Austin v. Bell, 126 F.3d 843 (6th Cir.1997), cert. denied, 523 U.S. 1079, 118 S.Ct. 1526, 140 L.Ed.2d 677 and 523 U.S. 1088, 118 S.Ct. 1547, 140 L.Ed.2d 695 (1998). Following a resentencing hearing, the jury again imposed a sentence of death, and the Court of Criminal Appeals affirmed. On automatic appeal under Tennessee Code Annotated section 39-13-206(a)(l) (1997), we designated the following issues for oral argument:[1] 1) whether the trial court committed reversible error in excluding certain mitigating evidence; 2) whether the trial court committed reversible error in admitting victim impact evidence; and 3) whether the sentence of death is disproportionate, and all other issues mandated by Tennessee Code Annotated section 39-13-206(e)(l). Having carefully reviewed these issues and the remainder of the issues raised by Austin, we conclude that they do not warrant relief. Accordingly, we affirm the Court of Criminal Appeals in all respects.
FACTUAL BACKGROUND
In early 1977 Watkins was an undercover agent investigating illegal gambling at the Golden Cue, Austin’s pool hall in Memphis. Based on Watkins’ work, indictments were returned against Austin, his wife, and several of his employees and associates, including Terry Lee Casteel. Watkins was to be the principal witness against them. At the resentencing hearing, Casteel testified for the State that Austin was upset about the gambling *457 charges and blamed Watkins.[2] Austin told Casteel, “I need to do something about it. I need to take care of him.” Austin eventually hired Jack Charles Blankenship, an escaped convict, to murder Watkins. On the evening of May 22, 1977, Casteel and Blankenship drove to Watkins’ house, but Watkins was not at home. Blankenship spent the night in a trailer owned by Austin’s wife. The next morning Casteel drove Blankenship to Watkins’ automobile body repair shop. Blankenship lured Watkins outside and then fatally shot him in the head, neck, and chest. Casteel and Blankenship returned to the trailer, where Austin paid Blankenship $980 for the murder.[3]
Marilyn Lee Pryor, who worked at the Golden Cue, testified that in early May 1977 Austin commented that Watkins was an “S O B, and that he should have his brains shot out.” Pryor saw a man fitting Blankenship’s description leave the Golden Cue with Austin and Casteel the night before Watkins’ murder. The next morning, as Austin and Casteel were leaving the Golden Cue, Austin told Pryor that “they had to take care of some business.” When Pryor later told Austin that she had given the police a statement in connection with the murder investigation, he told her that she was a “stupid, cold bitch and that [she] should have been killed, too.”
In addition to proof regarding the circumstances of the murder, the State introduced victim impact evidence. Carolyn Watkins Cupp, Watkins’ widow, testified that the victim had been a loving, kind, generous, hard-working man who had been active in his community. Steve Watkins, the youngest of the victim’s three sons, testified that he was eight years old at the time of the murder. He described his father as everything to him and as good as anyone can be. Both witnesses testified that Watkins’ death had left an emptiness in the family.
The defense tried to create lingering doubt as to Austin’s involvement in the murder. The defense theory was that Casteel had hired Blankenship. Levi Haywood, an inmate who had been in jail with Casteel in 1977, testified that Casteel told him that Austin was not involved in Watkins’ murder. Troy Bullock, a friend of Austin, testified that several days before Watkins’ murder Casteel picked up a piece of paper with Blankenship’s telephone number on it and stated, “I will take care of this.... I’m taking care of [Austin’s] business.”
The defense called Blankenship, the actual killer, to testify on Austin’s behalf.[4] After supporting Austin’s innocence for twenty-two years, Blankenship suddenly and surprisingly repudiated his prior statements. Blankenship stated that he had Med in the past and would now tell the truth because he had made his peace with God. Blankenship then testified in detail about the circumstances of the killing and how Austin had recruited and paid him to murder Watkins.
The defense next introduced testimony from employees of the Department of Correction that Austin, who at the time of resentencing was almost sixty years old, *458 was a model prisoner and a man of good character. Austin had only one minor disciplinary write-up in his twenty-two years on death row and had achieved the highest classification level possible based on good behavior. He was a teacher’s aide and tutored other inmates for the GED examination. Two retired guards told how Austin had saved their lives during a prison riot in 1985.
Members of Austin’s family testified that Austin was the fourth of eight children and was a good pool player. At the time of resentencing, he suffered from diabetes. Despite his long years in prison, Austin remained in close contact with family members who visited him often. His stepdaughter described Austin as kind, generous, and honest.
The last witness for the defense was Dr. Mark Cunningham, a clinical and forensic psychologist, who had evaluated Austin. Dr. Cunningham opined that there was a very high likelihood that Austin would continue to have a good adjustment to incarceration and a low to very low likelihood that he would commit acts of serious violence. Dr. Cunningham also stated that Austin’s presence would tend to reduce overall violence in the prison system.
Based on this proof, the jury found that the State had proven beyond a reasonable doubt the following aggravating circumstance: “The defendant committed the murder for remuneration or the promise of remuneration, or employed another to commit the murder for remuneration or the promise of remuneration.” Tenn.Code Ann. § 39-2404(i)(4) (Supp.1977).[5] In addition, the jury found that the State had proven that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt.[6] As a result, the jury sentenced Austin to death.
EXCLUSION OF MITIGATING EVIDENCE
Austin challenges the trial court’s exclusion of certain mitigating evidence during the resentencing hearing. Specifically, Austin contends that the trial court erroneously excluded the following evidence: 1) a vice squad report requesting indictments based on Watkins’ undercover gambling investigation; 2) testimony of Terry Casteel that Austin had reported his automobile stolen while Casteel was using it; 3) testimony of Reverend Joe Ingle about Austin’s actions during a 1985 prison riot; and 4) a 1995 deposition of Jack Charles Blankenship.
The admissibility of evidence at the resentencing hearing in this case is governed primarily by Tennessee Code Annotated section 39-2404(c) (Supp.1977) [now section 39-13-204(c) (Supp.2001) ],[7] which provides:
In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of *459 the crime; the defendant’s character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i) below; and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the state of Tennessee.
Under this statute, any evidence relevant to the circumstances of the murder, the aggravating circumstances of the murder, or the mitigating circumstances, which has probative value in the determination of punishment, is admissible. State v. Teague, 897 S.W.2d 248, 250 (Tenn.1995). Because the exclusion of mitigating evidence potentially undermines the reliability of the sentencing determination, we review any error in failing to admit such evidence under a constitutional harmless error standard. See State v. Cauthern, 967 S.W.2d 726, 739 (Tenn.1998).
Vice Squad Report
During the testimony of Floyd Cupp, the defense sought to introduce a vice squad report, dated March 31, 1977, requesting indictments on several people based on Watkins’ undercover gambling investigation. Cupp was a retired Memphis police officer who had worked with Watkins during the undercover gambling investigation and had prepared the report. The defense argued that the report was evidence of other persons who had a motive for killing Watkins. The trial court refused to admit the report on the ground that it was hearsay.
Contrary to the ruling of the trial court, hearsay is admissible in a capital sentencing hearing. See State v. Odom, 928 S.W.2d 18, 28 (Tenn.1996). The Rules of Evidence should not be applied to preclude the admission of relevant evidence in a capital sentencing hearing. See State v. Sims, 45 S.W.3d 1, 14 (Tenn.2001). Because Austin did not offer any evidence linking any of the other persons named in the vice squad report to Watkins’ murder, the report was of negligible probative value. However, it was not irrelevant. Evidence concerning other persons who had a motive to kill Watkins was relevant to support residual doubt as a nonstatutory mitigating circumstance. The trial court allowed defense counsel to cross-examine Cupp concerning the names contained in the report. If testimony concerning the content of the vice squad report was relevant enough to be admissible, then the report was admissible as well. We therefore conclude that the trial court erred in excluding the report. However, because the essence of the vice squad report was admitted through Cupp’s testimony, the error in excluding the report itself was harmless beyond a reasonable doubt. See Cauthern, 967 S.W.2d at 739.
Testimony of Terry Casteel
Terry Casteel testified that he had used Austin’s Cadillac to drive Marilyn Pryor to her home in Greenwood, Mississippi, two or three days after Watkins’ murder. On cross-examination, defense counsel asked Casteel if he knew that Austin had reported to the Memphis Police Department that the automobile had been stolen. After Casteel answered that he had been told that Austin had made the report, the trial court sustained the State’s *460 hearsay objection. Austin complains that the trial court erred by excluding as hearsay Casteel’s acknowledgment that Austin reported his automobile stolen.
The defense theory was that Austin would not have alerted the police to look for the automobile while Casteel was using it if the two men had been accomplices in Watkins’ murder. Evidence that Austin reported his automobile stolen therefore was relevant to rebut proof that Austin had orchestrated Watkins’ murder with Casteel and Blankenship. As we indicated above, hearsay is admissible in a capital sentencing hearing. Therefore, the trial court erred in sustaining the State’s hearsay objection. We conclude, however, that any error in failing to admit Casteel’s statement was harmless beyond a reasonable doubt. The jury was unlikely to find that Austin’s reporting the automobile stolen several days after the shooting rebutted the overwhelming evidence establishing that Austin and Casteel were accomplices in Watkins’ murder.
Testimony of Reverend Joe Ingle
As mitigation proof, Austin presented the videotape depositions of two retired prison guards, Hardin Green and John Owen, describing Austin’s actions diming a 1985 prison riot. Both Green and Owen testified that Austin protected them and five other guards from inmates in the general population who had started a riot and were trying to break into the death-row unit. Later, Austin presented the testimony of Reverend Joe Ingle, a prison minister who had had a pastoral relationship with Austin for twenty-two years. After relating information about Austin, Ingle was asked to specifically recall the 1985 prison riot. Ingle explained that his knowledge of the riot was gained from conversations with John Owen. When In-gle began to relate what Owen had told him, the State objected. The trial court sustained the objection, finding that In-gle’s testimony was hearsay[8] and duplicated Owen’s testimony.
As a preliminary matter, we note that Austin failed to make an offer of proof concerning Ingle’s testimony. Under similar circumstances, we have held that the issue is waived. See State v. Stout, 46 S.W.3d 689, 704 n. 10 (Tenn.2001); see also Sims, 45 S.W.3d at 15. Because Ingle’s testimony about Austin’s actions during the riot presumably would have mirrored Owen’s testimony, we conclude that the record is adequate for review. We will therefore address the issue on its merits.
Citing Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), Austin contends that Ingle’s testimony was not cumulative because Ingle was the only live witness presented to testify regarding Austin’s actions during the riot. In Skipper, the United States Supreme Court determined that mitigating testimony about the defendant’s good behavior in prison was not cumulative because it came from disinterested witnesses such as jailers while the earlier evidence had come from the defendant and his family and was the type of evidence a jury would naturally discount as self-serving. 476 U.S. at 7-8, 106 S.Ct. 1669. Unlike Skipper, the jury in Austin’s case already had heard the testimony of two disinterested witnesses—Green and Owen—concerning the mitigating evidence. Moreover, the excluded testimony was based on second-hand knowledge, not first-hand observation as in Skipper. Ingle’s testimony was no less cumulative because the prior testimony was presented by videotape depositions.
*461 A finding that mitigating evidence is cumulative, however, does not make such evidence inadmissible. As we have indicated, the Rules of Evidence do not govern the admissibility of evidence under Tennessee Code Annotated section 39-2404(e) (Supp.1977) [now section 39-18-204(c) (Supp.2001) ]. See Sims, 45 S.W.3d at 14. We have found error when a trial court excluded mitigating evidence on the ground that it was cumulative. See Cauthern, 967 S.W.2d at 738. In that case, the trial court excluded a letter written to the defendant from his eight-year-old son expressing love and support. In light of the principles expressed in section 39-13-204(c), we concluded that the trial court erred in excluding the letter. 967 S.W.2d at 738. We further held, however, that the error was harmless beyond a reasonable doubt because the essence of the evidence was presented to the jury in other forms. Id. at 739.
In the present case, the excluded evidence was more than cumulative — it was duplicative. Ingle was not an eyewitness to Austin’s actions during the prison riot. Ingle could only repeat what Owen had told him. With no offer of proof to demonstrate otherwise, we must assume that Ingle’s testimony would have consisted of hearsay duplicating Owen’s previous testimony. Notwithstanding the principles expressed in § 39-2404(c) (Supp.1977) [now § 39-13-204(c) ], a trial court still retains some discretion in controlling the presentation of proof in a capital sentencing hearing within the confines of constitutional requirements. See Sims, 45 S.W.3d at 14. Given the duplicative nature of Ingle’s hearsay testimony, we are unable to conclude that the trial court erred in excluding the evidence. Furthermore, even if Ingle’s testimony should have been admitted, any error in excluding the testimony was harmless beyond a reasonable doubt. See Cauthern, 967 S.W.2d at 739.
Deposition of Jack Charles Blankenship
In a deposition taken in 1995 for Austin’s federal habeas corpus proceedings, Blankenship denied that Austin had any involvement in Watkins’ murder. During the resentencing hearing, however, Blankenship repudiated his prior statements. To counter Blankenship’s testimony, the defense cross-examined Blankenship concerning his prior statements and then sought to introduce as substantive evidence the 1995 deposition of Blankenship in its entirety. The trial court denied the request but permitted the deposition to be marked as an exhibit for the limited purpose of impeaching the witness. The court instructed the jury accordingly.
As we have previously stated, hearsay is admissible in a capital sentencing hearing. Blankenship’s 1995 deposition was relevant to rebut the aggravating circumstance that the murder was committed for remuneration and to support residual doubt as a nonstatutory mitigating circumstance. Therefore, the trial court erred in not allowing the deposition to be used as substantive evidence. Although the trial court did not completely exclude the deposition, the limitation on the jury’s consideration of the deposition potentially undermined the reliability of the sentencing determination and is, therefore, an error of constitutional magnitude. Cf. Cauthern, 967 S.W.2d at 739.
Austin contends that the error was not harmless for several reasons. First, he argues that the limitation on the jury’s consideration of the deposition cannot be harmless beyond a reasonable doubt because the deposition was relevant to rebut the only aggravating circumstance. Austin has presented no authority and we *462 have found no support for a per se reversible error rule in cases where only one aggravating circumstance exists. Second, Austin contends that the only other proof supporting the aggravating circumstance— the testimony of Terry Casteel — lacked credibility. Contrary to Austin’s assertion, overwhelming evidence, including the testimony of Marilyn Pryor corroborating Cas-teel’s testimony, supported the aggravating circumstance. Finally, Austin asserts that the error cannot be harmless because Blankenship’s testimony in the deposition was “compelling and unequivocal.” The jury was in the best position to assess the credibility of Blankenship. If, despite vigorous cross-examination, the jury believed Blankenship’s recantation of his prior deposition testimony, it is unlikely that reading the entire deposition into evidence would have produced a different result.
In a similar case, we found the exclusion of such mitigating evidence to be harmless beyond a reasonable doubt. See Stout, 46 S.W.3d at 705. In Stout, the defendant sought to introduce the testimony of two accomplices in an effort to show that his own involvement in the murder was minor. The defendant also sought to call a chaplain to testify about a gang practice of blaming crimes on former members. Although we concluded that the trial court erred in excluding the proposed mitigating evidence, we held that the error was harmless beyond a reasonable doubt. The testimony of the accomplices was of dubious value because they had testified during the guilt phase that the defendant led the offenses and shot the victim. Id. Likewise, other evidence was presented regarding the defendant’s theory that he was falsely accused by gang members, and this evidence obviously was rejected by the jury. Id. Like the evidence in Stout, the excluded evidence in this case was of dubious value. Blankenship testified at the resen-tencing hearing that Austin hired him to kill Watkins. The 1995 deposition proclaiming Austin’s innocence likely would not have been very persuasive to the jury since Blankenship fully admitted that the deposition testimony was false. Additionally, just as in Stout, Austin presented other proof to support his residual doubt theory, and the proof obviously was rejected by the jury.
In State v. Hartman, 42 S.W.3d 44 (Tenn.2001), we reversed the sentence because of a combination of errors: the exclusion of evidence relevant to residual doubt as a mitigating circumstance and insufficient evidence to support one of the aggravating circumstances. Id. at 59. The present case is distinguishable from Hartman. Unlike Hartman, the jury in this case did not rely on an invalid aggravating circumstance. Moreover, the residual doubt evidence in this case was not completely excluded. Substantial portions of the deposition were read to the jury during Blankenship’s testimony. The entire deposition was introduced as an exhibit. The jury was precluded only from considering the deposition as substantive evidence.
The practical effect of using the deposition for impeachment purposes was not much different than introducing it as substantive evidence. The jury was presented with two theories: either Austin hired Blankenship to commit the murder or Austin did not. Rejection of the first theory would necessarily mean acceptance of the second. If the jury had found that the deposition impeached Blankenship’s credibility, then the jury would not have believed Blankenship’s testimony at the re-sentencing hearing and would have found, instead, that Austin did not hire Blankenship to murder Watkins. It is not likely that the result would have been any different if the deposition had been introduced as substantive evidence. The limitation on *463 the jury’s consideration of the deposition did not affect the jury’s decision to Austin’s prejudice and was, therefore, harmless beyond a reasonable doubt.
VICTIM IMPACT EVIDENCE
The trial court admitted victim impact evidence from Carolyn Watkins Cupp, the victim’s widow, and Steve Watkins, one of the victim’s sons. Austin raises three arguments regarding the victim impact evidence. First, Austin contends that the evidence was unduly prejudicial and cumulative. Second, he asserts that the trial court failed to follow the procedure set out in State v. Nesbit, 978 S.W.2d 872, 891 (Tenn.1998). Finally, he claims that the prosecutor’s closing argument regarding the function of victim impact evidence was improper under Nesbit.
Victim impact evidence and prosecutorial argument on the evidence are not barred by the Tennessee Constitution or the Constitution of the United States. See Nesbit, 978 S.W.2d at 889. However, not all victim impact evidence is admissible. Victim impact evidence may not be introduced if 1) it is so unduly prejudicial that it renders the trial fundamentally unfair, or 2) its probative value is substantially outweighed by its prejudicial impact. See id. at 891. Generally, victim impact evidence should be limited to information which provides “a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual’s death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim’s immediate family.” Id.
The victim impact evidence about which Austin complains was limited to the victim’s role as husband and father and to the loss suffered by the victim’s immediate family. This evidence is of the nature contemplated by Nesbit and is similar to the victim impact evidence found appropriate in State v. Smith, 998 S.W.2d 6, 17 (Tenn.1999). We conclude that the victim impact evidence in this case was not cumulative or unduly prejudicial and that its probative value was not substantially outweighed by its prejudicial impact.
In Nesbit, we established the following procedural guidelines for the admission of victim impact evidence: 1) the State must notify the trial court of its intent to produce victim impact evidence; 2) upon receiving notification, the trial court must hold a hearing outside of the presence of the jury to determine the admissibility of the evidence; and 3) the victim impact evidence should not be admitted until the trial court determines that evidence of one or more aggravating circumstances is already present in the record. 978 S.W.2d at 891. Austin asserts that this procedure is constitutional in nature. Although the admission of unduly prejudicial victim impact evidence may implicate due process concerns, the procedure established in Nesbit is not constitutionally mandated. This procedure merely enables the trial court to adequately supervise the admission of victim impact evidence. See id.
In compliance with the procedural requirement established in Nesbit, the State in this case notified the trial court of its intent to introduce victim impact evidence, and the trial court conducted a jury-out hearing to determine the admissibility of the evidence. However, Nesbit’s third requirement was not fulfilled when the trial court allowed the victim impact testimony of Watkins’ widow to be presented before any proof of an aggravating circumstance existed in the record. Requiring the existence in the record of proof of an aggravating circumstance be *464 fore the presentation of victim impact evidence lessens the risk that the admission of unduly prejudicial victim impact evidence will render the trial fundamentally unfair. If unduly prejudicial victim impact evidence is admitted first, then the danger exists that the jury may not fairly consider the other evidence presented at the sentencing hearing. Because the victim impact testimony of Watkins’ widow was not unduly prejudicial, we conclude that the variance from the procedure established in Nesbit did not affect the result of the resentencing hearing on the merits and, therefore, was harmless error. See Tenn. R.Crim. P. 52(a).
In his final challenge to the victim impact evidence, Austin contends that the prosecutor improperly told the jury how to weigh the evidence. In Nesbit, we cautioned that victim impact evidence “does not carry the force and effect of an aggravating circumstance in the sentencing calculation.” 978 S.W.2d at 894. We held that the prosecutor in that case erroneously characterized the victim impact evidence as an aggravating circumstance to weigh against mitigation proof. Id. In the present case, the prosecutor specifically told the jury that they could only weigh aggravating and mitigating circumstances. The prosecutor’s comment that they were also required to consider “the impact of this crime” did not improperly characterize the victim impact evidence as an aggravating circumstance. Accordingly, we find no error in the prosecutor’s closing argument.
PROPORTIONALITY REVIEW
We are bound by statute to review the application of the death penalty to determine whether:
(A)The sentence of death was imposed in any arbitrary fashion;
(B) The evidence supports the jury’s finding of statutory aggravating circumstance or circumstances;
(C) The evidence supports the jury’s finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.
TenmCode Ann. § 39 — 13—206(c)(1) (1997). Having thoroughly reviewed the record, we find that the sentence of death was not imposed in an arbitrary fashion. We conclude that the State presented sufficient proof to uphold the jury’s finding of the aggravating circumstance in Tennessee Code Annotated section 39 — 2404(i) (4) (Supp.1977): “The defendant committed the murder for remuneration or the promise of remuneration, or employed another to commit the murder for remuneration or the promise of remuneration.” This aggravating circumstance was amply supported by the testimony of Casteel and Blankenship that Austin hired Blankenship to murder Watkins. We further hold that the evidence supports the jury’s finding that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt. Contrary to Austin’s assertion, a reasonable jury could have found that the proffered mitigating circumstances of residual doubt, relative culpability for the offense, and positive prison behavior were outweighed by the aggravating circumstance.
We next determine whether the sentence of death in this ease is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. See Tenn.Code Ann. § 39-13-206(c)(l)(D) (1997). We are *465 mindful of the following principles applicable to proportionality review:
In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. ■ A sentence of death may be found disproportionate if the case being reviewed is “plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed.” A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. Our inquiry, therefore, does not require a finding that a sentence “less than death was never imposed in a case with similar characteristics.” Our duty “is to assure that no aberrant death sentence is affirmed.”
State v. Hall, 976 S.W.2d 121, 135 (Tenn.1998) (citations omitted). We have found the following factors helpful in choosing and comparing cases: 1) the means and manner of death; 2) the motivation for killing; 3) the place of death; 4) the similarity of the victims and treatment of the victims; 5) the absence or presence of premeditation, provocation, and justification; and 6) the injury to and effects on non-decedent victims. Id. In comparing defendants, we consider the following traits: 1) prior criminal history; 2) age, race, and gender; 3) mental, emotional, and physical condition; 4) role in the murder; 5) cooperation with authorities; 6) remorse; 7) knowledge of helplessness of victim; and 8) capacity for rehabilitation. Id.
In the present case, the victim was shot execution-style in the head and then several more times in the neck and chest. The motive for the killing was to retaliate against the victim for his undercover work exposing Austin’s illegal gambling. The murder clearly was premeditated in that Austin hired another person to commit the murder.
Austin, a white male, was thirty-seven years old at the time of the murder and almost sixty years old at the time of the resentencing hearing. A psychologist testified for the defense that an inmate of Austin’s age was exceedingly unlikely to commit acts of serious violence in prison. Austin presented mitigating evidence attesting to his positive contributions to the prison community while incarcerated and his efforts to ensure the safety of prison guards during a prison riot. No evidence of prior criminal history was presented at the resentencing hearing.[9] Austin’s role in the murder was significant in that he instigated the plan to murder the victim and hired the actual killer. No evidence was presented to show that Austin cooperated with the authorities or showed any remorse for the murder. Considering the nature of the crime and the defendant, we conclude that this murder places Austin into the class of defendants for whom the death penalty is an appropriate punishment.
Austin contends that his sentence is comparatively disproportionate because his co-defendants, Casteel and Blankenship, received lesser sentences. Statutory proportionality review involves a comparison only with cases in which a capital sentencing hearing was actually conducted. See State v. Bland, 958 S.W.2d 651, 666 (Tenn.1997). Because neither Blankenship nor Casteel was subjected to capital pro *466 ceedings, their cases are not similar cases for purposes of proportionality review.
Citing Nuthill v. State, 30 Tenn. (11 Hum.) 247 (1850), Austin argues that he could not receive a greater sentence than Blankenship as a matter of law because a defendant convicted as an accessory before the fact cannot be sentenced to death if the principal received a life sentence. Austin’s reliance on Nuthill is misplaced. At the time of the offense in this case, Tennessee Code Annotated section 39-2407 (Supp.1977) expressly provided that the punishment imposed upon an accessory before the fact of murder in the first degree did not depend on the sentence imposed on the principal.
Austin also asserts that he has not found a case in Tennessee history in which an accessory before the fact received a sentence of death and the principal was sentenced to life. Tennessee law no longer distinguishes between accessory before the fact and the principal. In three cases, we have upheld the death penalty for the person who instigated the murder — the equivalent of accessory before the fact — when the actual killer received a lesser sentence. See State v. Stevens, 78 S.W.3d 817 (Tenn.2002); State v. Hutchison, 898 S.W.2d 161 (Tenn.1994); State v. Stephenson, 878 S.W.2d 530 (Tenn.1994).[10]
Based upon an exhaustive review of the record and Rule 12 reports from trial judges in trials for first degree murder, we conclude that the present case is proportionate when compared to other murders for hire in which the death penalty was imposed. See Stevens, 78 S.W.3d 817 (defendant hired acquaintance to murder wife and mother-in-law); Hutchison, 898 S.W.2d 161 (defendant hired several people to drown victim for insurance proceeds); Stephenson, 878 S.W.2d 530 (defendant hired acquaintance to kill wife); State v. Wilcoxson, 772 S.W.2d 33 (Tenn.1989) (defendant, who was hired by wife of victim to kill her husband, procured brother to commit offense);[11] State v. Porterfield, 746 S.W.2d 441 (Tenn.1988) (defendant hired co-defendant to kill husband); State v. Coker, 746 S.W.2d 167 (Tenn.1987) (defendant arranged for murder of paramour’s husband).[12] In two of these cases, murder for hire was the sole aggravating circumstance. See Hutchison, 898 S.W.2d 161, Stephenson, 878 S.W.2d 530. After reviewing these cases, and many others not cited, we conclude that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.
We have considered Austin’s argument that the only Tennessee cases similar to his are those of William Groseclose and Ronald Rickman. Groseclose hired Rick-man and another man to kill his wife. On direct appeal, we found the death sentences to be proportionate. State v. Gro *467 sedose, 615 S.W.2d 142, 150-51 (Tenn.1981). In federal habeas corpus proceedings, the convictions and sentences were reversed based on ineffective assistance of counsel. See Grosedose v. Bell, 130 F.3d 1161 (6th Cir.1997); Rickman v. Bell, 131 F.3d 1150 (6th Cir.1997). On retrial, the jury again convicted Groseclose and Rick-man of first degree murder but sentenced them to life imprisonment. The Rule 12 report reflects that the trial judge was of the opinion that the jury did not impose the death penalty because of the defendants’ twenty years of good behavior in prison. As we have stated many times, “the isolated decision of a jury to afford mercy does not render a death sentence disproportionate.” State v. Keen, 31 S.W.3d 196, 222 (Tenn.2000) (citations omitted). We recently affirmed the sentence of death in a resentencing case involving similar mitigating evidence of good behavior in prison. See Terry v. State, 46 S.W.3d 147 (Tenn.2001). Given the numerous similar cases in which the death penalty has been imposed, we are unable to conclude that the sentence of death imposed by the jury in this case represents an aberrant sentence.
CONCLUSION
In accordance with Tennessee Code Annotated section 39 — 13—206(c)(1) and the principles adopted in prior decisions, we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury’s finding of the statutory aggravating circumstance, that the evidence supports the jury’s finding that the aggravating circumstance outweighs mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.
Having carefully considered the issues raised by Austin regarding the exclusion of mitigating evidence and the admission of victim impact evidence, we hold that these issues are without merit or do not require reversal. Having reviewed all of the other issues raised by Austin, we conclude that they do not warrant relief. With respect to issues not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are incorporated herein and are attached as an appendix. The defendant’s sentence of death is affirmed and shall be carried out on the 23rd day of January, 2003, unless otherwise ordered by this Court or proper authority. It appearing that defendant Richard Hale Austin is indigent, costs of this appeal are taxed to the State of Tennessee.
ADOLPHO A. BIRCH, JR., J., filed a dissenting opinion.

. “Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed . at oral argument_” Tenn. R. Sup.Ct. 12.2.

.Casteel also had testified against Austin in the original trial. At that time Casteel was charged with first degree murder in connection with Watkins' death. He eventually pleaded guilty to second degree murder and received a twenty-year sentence.

. Austin had agreed to pay $1000, but he subtracted $20 for the case of beer Blankenship had received the night before the murder.

. Blankenship, who had pleaded guilty to first degree murder and received a life sentence, did not testify at the original trial.

.The State also sought the death penalty based on the aggravating circumstance in Tennessee Code Annotated section 39-2404(i)(6) (Supp.1977): "The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another.” The jury did not find this aggravating circumstance.

. Austin was not entitled to the "beyond a reasonable doubt” weighing standard because the offense was committed before the death penalty statute was amended in 1989. Any error in this regard, however, inured to Austin’s benefit. See State v. Bush, 942 S.W.2d 489, 506 n. 10 (Tenn.1997).

. The sentencing law at the time the murder was committed is the applicable law. State v. Brimmer, 876 S.W.2d 75, 82 (Tenn.1994).

. As we previously noted, hearsay is admissible in a capital sentencing hearing.

. The trial judge’s report under Tenn. Sup.Ct. R. 12 reflects a 1966 larceny conviction and a 1961 robbery conviction.

. In Stephenson, the case was remanded for resentencing due to an instructional error during the sentencing phase of the trial. 878 S.W.2d at 556. On remand, the parties reached an agreement to reduce the sentence to life without the possibility of parole. On appeal, we held that the life without parole sentence was illegal because it was not a legal sentencing option at the time of the offense. Stephenson v. Carlton, 28 S.W.3d 910, 912 (Tenn.2000). A new sentencing hearing has not been held.

. Upon post-conviction review Wilcoxson was granted relief as to his sentence based on ineffective assistance of counsel. See Wilcox-son v. State, 22 S.W.3d 289 (Tenn.Crim.App. 1999). A new sentencing hearing has not been held.

. Upon post-conviction review Coker was granted relief as to his sentence based on ineffective assistance of counsel. At a bench trial on resentencing, Coker was sentenced to life imprisonment. See Coker v. State, No. 01C01-9804-CC-00152, 1999 WL 228789 (Tenn.Crim.App. 1999).