IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
March 23, 2011 Session

**LISA FAYE ROLAND CAMP**
**v.**
**RANDY COLEMAN CAMP**

**Appeal from the Chancery Court of Crockett County**
**No. 8752    George R. Ellis, Chancellor**

---

**No. W2010-01037-COA-R3-CV - Filed June 29, 2011**

---

This post-divorce appeal involves recusal of the trial judge. In the initial divorce proceedings, the trial judge recused himself based in part on friendship with the parties. A special judge was appointed to hear the case. The special judge tried the divorce, divided the parties' property, and awarded the wife alimony *in futuro*. Several years later, the husband filed a petition to terminate or modify his alimony obligation. The trial judge who had previously recused himself declined to do so for the post-divorce proceedings. After a hearing, the trial judge terminated the husband's alimony obligation. The wife appeals, arguing that the trial judge should have recused himself and that he erred in terminating the alimony. We reverse the trial court's decision on recusal, and therefore vacate the trial court's ruling on the husband's petition to modify.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part, Vacated in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and JOE G. RILEY, SP. J., joined.

Michael A. Carter, Crocker & Carter, PLLC, Milan, Tennessee, for Plaintiff/Appellant, Lisa Faye Roland Camp.

Sam J. Watridge, Watridge Law Firm, Humboldt, Tennessee, for Defendant/Appellee, Randy Coleman Camp.

# OPINION

## FACTS AND PROCEEDINGS BELOW

This is the second appeal in these acrimonious divorce proceedings between Plaintiff/Appellant Lisa Faye Roland Camp ("Wife") and Defendant/Appellee Randy Coleman Camp ("Husband"). *See Camp v. Camp*, No. W2006-02644-COA-R3-CV, 2008 WL 639714 (Tenn. Ct. App. Feb. 28, 2008). When Wife filed her divorce complaint in August 2005, after two children and approximately twenty years of marriage, the case was assigned to the Honorable George R. Ellis, Chancellor for Crockett County, Tennessee. At the time, Husband was employed as the Director of the Administrative Office of the Courts of Tennessee ("AOC"). On March 1, 2006, Chancellor Ellis recused himself from the case on his own motion. As notification and explanation, Chancellor Ellis wrote the following letter to the AOC:

> By this letter I am recusing myself from hearing the above styled case. This is based on two issues: One, my wife and I are personal friends with the parties; Two, there is a perception of a conflict due to the fact that [Husband] controls all the administration of my office and every judge's office in Tennessee.

The AOC coordinates the appointment of special judges when necessary. After Chancellor Ellis recused himself, Senior Judge Jon Kerry Blackwood, sitting by designation, tried the parties' divorce in September 2006.

The proof in the divorce trial showed that Wife had an associate's degree, but was a homemaker throughout most of the parties' marriage. By the time of trial, Wife had not been employed outside the home for fifteen years. The trial court determined her earning capacity to be between $25,000 and $40,000 per year.

In contrast, at the time of the parties' divorce, Husband was a successful politician and attorney. During the parties' marriage, Husband had served as an Assistant District Attorney, a Claims Commissioner for the State of Tennessee, a Judge of the General Sessions Court, a staff member for a U.S. Congressman, the Chief of Staff for Lieutenant Governor John Wilder, and the Director of Personnel for the State of Tennessee under Governor Phil Bredesen. In January 2006, Husband was appointed as the Director of the AOC. By the time of the divorce trial, Husband had tendered his resignation from that position, to be effective in October 2006, and he was looking for employment. *Id.* at *1. However, at the divorce trial, his earning capacity was based on his $120,000 per year salary as Director of the AOC.

-2-

At the conclusion of the trial, Judge Blackwood divided the martial property and debt.[1]  At the time of the divorce, one of the parties' two children was still a minor, so Husband was ordered to pay child support in the amount of $1165 per month and  private school tuition of nearly $500 per month.  Wife was awarded alimony *in futuro* of $1600 per month.  Husband was required to maintain a $250,000 life insurance policy and provide health insurance for the parties' minor child.  Husband was also ordered to pay Wife $5000 in attorney fees and costs.[2]

Both parties appealed Judge Blackwood's decision to this Court.  *Id*. at *2.  This Court affirmed the trial court decision in all respects.  *Id* at *4.

Meanwhile, after the divorce, Husband remained unemployed until January 2007.  At that time, he was hired by a government relations firm as a lobbyist, earning $150,000 per year.  In April 2008, at the urging of the Democrat Party operatives, Husband became a candidate for the State Senate to replace former Lt. Governor Wilder.  Upon declaring his candidacy, he resigned his position with the government relations firm.  After a lengthy campaign marked by actions adverse to Husband by Wife and members of Wife's family, Husband lost the election to Republican candidate Delores Gresham.  After that, Husband remained unemployed until he finally took a position with his cousin's law firm in April 2009, earning some $25,000 per year, without benefits.[3]

During the same time period, Wife obtained employment, earning approximately $33,000 per year in gross income.  Her employment included benefits such as health insurance.

---

[1]Wife received the marital home, furniture and three one-acre lots in a subdivision, stock of $248,162.53, a mutual fund account of $26,000, a savings account of $2,847, and a personal account of $260.  Husband received his 401(k) valued at $85,000, his pension valued at $32,000, his bank accounts in the amount of $5800, a farm, and three rental buildings.  The parties split stock valued at $69,133.07.  Each party was awarded an automobile.

[2]Post-divorce skirmishing occurred on implementing the terms of the final decree of divorce.  The disputes centered on child support and health and life insurance.  These disputes were decided by Judge Blackwood.

[3]The record contains conflicting statements regarding Husband's income.  Husband testified at trial that he earned $25,000 for the year 2009, but does not specify whether this amount was gross income or net income.  The trial judge determined Husband's income to be $16,000, but did not specify whether such an amount was Husband's net income or his gross income.  Finally, Husband's 2009 tax return shows his adjusted gross income to be negative, a loss of $49,961.  For purposes of this appeal, we utilize the highest income amount of $25,000 in gross income per year.

In October 2009, Husband filed a petition to modify, seeking to terminate, or in the alternative reduce, his alimony obligation. Husband averred that, since the divorce, there had been a substantial and material change of circumstances, namely, his income had declined to approximately twenty-seven percent of his gross income in 2006 and his employment did not include benefits. Meanwhile, he said, Wife was employed, with benefits. Husband sought to have Wife pay his attorney fees associated with his petition to modify.

In response, Wife denied that there was a substantial and material change of circumstances justifying termination or reduction of alimony. She sought an increase in Husband's monthly alimony *in futuro* obligation, because the parties' youngest child had reached majority and Husband was no longer required to pay child support.[4]

The case remained in the Chancery Court of Crockett County. Although the previous post-divorce disputes had been decided by Judge Blackwood, sitting by designation, presumably Judge Blackwood's designation as special judge expired or otherwise ended.[5] Regardless, Husband's petition to modify, and Wife's cross-petition, remained before Chancellor Ellis.

In January 2010, Wife filed a motion for disqualification, asking Chancellor Ellis to recuse himself. Wife noted Chancellor Ellis' previous letter to the AOC recusing himself on his own motion on the basis of his personal friendship with the parties and Husband's position as Director of the AOC. Wife acknowledged that Husband was no longer the Director of the AOC, but argued that he was now affiliated with a law firm that appeared regularly before Chancellor Ellis. Wife also argued that "Husband has had in the past and is believed to still possess substantial political influence in the Democratic Party throughout western Tennessee, and with high-ranking political figures within the government of the State of Tennessee."

In response to Wife's motion for disqualification, Husband noted that he was no longer the Director of the AOC, and asserted that there was no reason for Chancellor Ellis to recuse himself. He argued that Chancellor Ellis had an obligation to refrain from recusing himself unless he was "truly required to do so."

Chancellor Ellis heard Wife's motion for disqualification on February 4, 2010. At the hearing, Wife's attorney made the same arguments that she made in her written motion.

---

[4]In the first appeal, the appellate court rejected Wife's contention that the trial court in the original divorce should have set the alimony *in futuro* award to automatically increase upon the emancipation of the youngest child and the resulting end of Husband's obligation to pay child support. *Camp*, 2008 WL 639714, at *3.

[5]The record is unclear on this point.

Wife's counsel argued that the facts taken as a whole created "the appearance of impropriety," and that consequently Chancellor Ellis should recuse himself from the case.

In response, Husband's attorney asserted that Chancellor Ellis had no duty to recuse himself in this cause, arguing that recusal should occur only where there is a "clear showing by the evidence" of a reason for it. Husband's counsel noted that the only issue before the trial court was whether Husband should continue paying Wife alimony *in futuro*, and also pointed out that Husband was no longer the Director of the AOC, and that Husband did not plan to handle cases in Chancellor Ellis's court.

On February 8, 2010, Chancellor Ellis issued an order denying Wife's motion for disqualification. In the order, Chancellor Ellis determined that he could be fair and impartial to both parties. The order explained:

> The Court further finds that it recused itself in 2006 due to Husband being employed at that time as the Director of the [AOC], a position that had control over the workings of this Court. The Court finds that Husband no longer serves as the Director of the [AOC], and therefore this Court does not have a conflict of interest. Furthermore, although Chancellor George R. Ellis is personally acquainted with the parties, the Court finds that Chancellor Ellis has not socialized in the homes of the parties, nor have the parties socialized in the home of Chancellor Ellis. The Court further finds that one of the difficulties of serving on the rural bench for more than thirty years is that the Court will sometimes know the parties in the cases litigated in such Court, but that fact in and of itself is insufficient to demand recusal.

Accordingly, Wife's motion for disqualification was denied, and Chancellor Ellis went on to consider the substantive issues in the case.

On March 17, 2010, a hearing was held before Chancellor Ellis on the parties' cross-petitions to modify Husband's alimony obligation. The trial court heard testimony from Husband, Wife, and Wife's brother.

Husband testified about the sequence of events following the parties' divorce and the reasoning for his decision to resign from his lobbying position and seek election to the State Senate. In describing the economic benefits that would accrue from winning such an election, Husband explained that, apart from the salary, benefits, staff, and expense reimbursements associated with the job, election to the State legislature would bring other legal opportunities for economic gain.

Under these circumstances, Husband argued, the decision to leave his employment with the government relations firm and run for election to the legislature was reasonable. After his campaign was underway, Husband testified, Wife's brother, other members of Wife's family, and ultimately Wife herself, sent open letters, mailed *en masse* to voters in the legislative district, accusing Husband of dishonest and immoral behavior.[6] Not surprisingly, Husband asserted that the letters to voters from Wife and her family created considerable controversy. Husband lost the election, and maintained that the effect of the disparaging letters was to sully his reputation and virtually destroy his ability to make money.[7]

After losing the election, Husband said, he sought other employment and found none. Finally, Husband accepted a position as an independent contract attorney with his cousin's law firm. In 2009, he testified, he earned approximately $25,000, without benefits.

In her testimony, Wife maintained that she still needed alimony. Documentation from her employer showed a gross income of $32,985 in 2009. She paid a modest portion of her income each month towards her health insurance.

Wife acknowledged that her family members sent letters to voters during Husband's campaign, and that she decided to send a letter as well. She claimed that she had no intent to adversely affect Husband's chances of winning the election, she simply "felt like the voters had the right to know, you know, what I knew, and then they could make the informed vote of who would they want to send to Nashville." Wife testified that, at the time of trial, she thought Husband could make more money, but offered no specific proof of how he could do so. She argued that he should sell more of his assets to pay her alimony. The trial court heard testimony about both parties' sale of assets to pay their expenses.

---

[6]The letters were made exhibits at trial. Wife's brother, Tommy Roland, sent a mass mailing to voters, stating that Husband engaged in numerous extramarital affairs. The letter attached the trial court's memorandum opinion in the divorce, which stated that Husband admitted adultery. Roland's letter told the recipients that his letter was motivated by "[c]oncerns about morality and values." Wife's mass mailing to voters stated that, contrary to Husband's "pro-life" stance in his campaign, he had "counseled abortion" on an unspecified past occasion. Wife's letter concluded, "There comes a time in everyone's life when truth is the most important thing no matter the consequences. Such is the case for me now."

[7]In response to cross-examination by Wife's counsel, Husband testified, "[B]ased on what your client and her family did to me during that campaign, it's made a big difference in my income." He added, "She . . . and her family made a concerted effort to go out here and ruin me for the rest of my life. I don't know what she's complaining about because they succeeded. They've done what they wanted to do. They wanted to ruin me, and they did it."

Wife's brother testified that he spent $14,000 to send bulk mail letters to voters during Husband's campaign. Wife's brother testified that he sent the letters to voters because of Husband's "misconduct" during his marriage to Wife.

After the testimony concluded, the trial court took a recess and then issued an oral ruling. In the oral ruling, the trial court found that after the divorce Husband became employed as a lobbyist with an annual salary of $150,000, and subsequently left that employment to campaign for election to the State Senate, at the encouragement of his many political allies. The trial court acknowledged Wife's argument that Husband's decision to leave the lobbying job to run for the State Senate seat was essentially a decision to become voluntarily under-employed. The trial court rejected this, stating: "The Court is not persuaded that this decision by a man who has held more than twelve public service jobs and whose political context made him 'a perfect lobbyist' . . . was ill advised." The trial court found that Wife and her family "colluded . . . to hurt" Husband's campaign, "demeaning the character and integrity of the petitioner." The trial court found that Wife well understood the potential effect of the letters at the time they were sent, and noted that Husband lost the election by only 5000 votes.

Following the election, the trial court found that "the doors that had always been open to [Husband] were slammed shut," and Husband could not return to either State government or lobbying. Ultimately, Husband accepted a position in his cousin's law firm. In that position, the trial court found, he earned $16,000 in 2009. The trial court observed that Wife had obtained employment that paid her a gross salary of $32,985.28 per year, but argued that Husband should sell more assets in order to continue paying alimony. The trial court rejected this, and concluded that Husband "does not make enough money to pay the alimony in futuro as ordered at least in part due to the choices and actions of" Wife. The trial court found that a material and substantial change of circumstances had occurred since the initial divorce that justified the termination of Husband's alimony *in futuro* obligation.[8]

Subsequently, the trial court issued a written order to the same effect, attaching and incorporating by reference a transcript of its oral ruling. Wife now appeals.

---

[8]The final order does not award Husband attorney fees, as he requested. We find that the trial court implicitly denied this claim.

**ISSUES ON APPEAL AND STANDARD OF REVIEW**

On appeal, Wife argues first that the trial judge erred in declining to recuse himself from the case, and that the trial court's decision should be reversed, remanded, and assigned to a different trial judge. In the alternative, Wife argues that the trial court erred in deciding to terminate her $1600 per month alimony *in futuro*. She claims error in the following respects:

> A. Wife's employment subsequent to the original trial is not a material change in circumstances that warrants modification of alimony *in futuro*.
>
> B. The fluctuation in income earned by Defendant/Appellee Randy Coleman Camp ["Husband"] subsequent to the original trial is not a material change in circumstances that warrants modification of alimony *in futuro*.
>
> C. Wife obtaining health insurance benefits subsequent to the original trial is not a material change in circumstances that warrants modification of alimony *in futuro*.
>
> D. The expiration of Husband's group health insurance benefits subsequent to the original divorce is not a material change in circumstances that warrants modification of alimony *in futuro*.
>
> E. Wife's selling of a marital asset awarded to her in the original divorce is not a material change in circumstances that warrants modification of alimony *in futuro*.

On the trial court's denial of her petition to increase alimony, Wife argues she is entitled to an increase in alimony *in futuro* because Husband is no longer required to pay child support for the parties' youngest child. In response, Husband maintains that the trial judge was correct in declining to recuse himself, and that the trial court's decision to terminate Husband's alimony *in futuro* obligation should be affirmed.

A trial judge's decision on whether to recuse himself is reviewed on appeal under an abuse of discretion standard. *Moody v. Hutchison*, 247 S.W.3d 187, 202 (Tenn. Ct. App. 2007) (citing *State, ex rel. Phillips v. Henderson*, 423 S.W.2d 489, 492 (Tenn. 1968)). Under the abuse of discretion standard of review, the trial court's ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citing *State v. Scott*, 33 S.W.3d 746; 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000)).

On the trial court's decision regarding the modification of spousal support, we note that modification of spousal support is "factually driven and calls for a careful balancing of numerous factors." ***Bogan v. Bogan***, 60 S.W.3d 721, 727 (Tenn. 2001). (citations omitted). "A] trial court is accorded wide discretion in modifying awards of spousal support. . . . 'Appellate courts are generally disinclined to second-guess a trial judge's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes.' " ***Hartman v. Hartman***, No. E2005-0010-COA-R3-CV, 2006 WL 2135454 at *4 (Tenn. Ct. App. July 31, 2006) (quoting ***Kinard v. Kinard***, 986 S.W.2d 220, 234 (Tenn. Ct. App. Aug. 5, 1998), *perm. app. den'd*.

## ANALYSIS

As a threshold matter, Wife asserts that Chancellor Ellis erred in refusing to recuse himself, contending that the appearance of bias or prejudice is enough to trigger a judge's recusal "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." ***Alley v. State***, 882 S.W.2d 810, 820 (Tenn. Ct. Crim. App. Apr. 20, 1994). Relying on Canon 3 of the Code of Judicial Conduct, contained in Rule 10 of the Tennessee Supreme Court Rules, Wife argues that members of the judiciary are supposed to recuse themselves not only in situations in which they have actual bias or prejudice, but also whenever their "impartiality might reasonably be questioned." ***Chumbley v. People's Bank & Trust Co***., 57 S.W.2d 787, 788 (Tenn. 1933); TENN. SUP. CT. R.10. In this case, in the initial divorce proceedings, Chancellor Ellis recused himself on his own motion, citing the fact that Husband was the Director of the AOC, as well as the fact that Chancellor Ellis and his wife were personal friends of Husband and Wife. Wife concedes that Husband is no longer the Director of the AOC, but contends that the issue of the personal relationship of the parties with Chancellor Ellis, deemed sufficient reason for recusal earlier, remains. Wife notes that the issue in this post-divorce action was also a primary issue during the original divorce proceedings. Wife insists that all of these facts would lead a person of ordinary prudence to reasonably question Chancellor Ellis's impartiality and therefore warranted recusal.

In response, Husband maintains that Chancellor Ellis did not err in declining to recuse himself from the parties' post-divorce proceedings. He asserts that "a judge should not decide to recuse unless recusal is truly called for under the circumstances," citing ***Rose v. Cookeville Regional Medical Center***, No. M2007-02368-COA-R3-CV, 2008 WL 2078056 at *1 (Tenn. Ct. App. May 14, 2008). Husband claims that the standard for recusal is whether a reasonable person aware of all the relevant facts would question the judge's impartiality. ***Kinard***, 986 S.W.2d at 228. Husband argues that the fact that he was serving as Director of the AOC was Chancellor Ellis's primary reason for recusal in the original divorce

proceedings, and that reason no longer exists. He emphasizes that a recusal decision is reviewed by the appellate court under an abuse of discretion standard.

The issue of recusal in this case is governed by Tennessee Supreme Court Rule 10, Canon 3(E)(1), which states:

> A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
> (a) the judge has a personal bias or prejudice concerning a party . . . .

Our Supreme Court has of late addressed the issue of recusal on several occasions. In ***In re: Hooker***, the Court outlined the current law on recusal:

> Motions for recusal call into question the integrity of the judicial process and require serious and careful consideration. Persons appearing in Tennessee's courts have a fundamental right to have their cases heard and decided by fair and impartial judges. ***Bean v. Bailey***, 280 S.W.3d 798, 803 (Tenn. 2009); ***Chumbley v. People's Bank & Trust Co.***, 165 Tenn. 655, 659, 57 S.W.2d 787, 788 (1933). This right "guard[s] against the prejudgment of the rights of litigants and [assists in] avoid[ing] situations in which the litigants might have cause to conclude that the court . . . reached a prejudiced conclusion because of interest, partiality, or favor." ***State v. Austin***, 87 S.W.3d 447, 470 (Tenn. 2002) (appendix).
> To protect this right, Article VI, Section 11 of the Constitution of Tennessee states that judges should not preside over trials in which they "may be interested." Likewise, Tenn. Sup. Ct. R. 10, Canon 2(A) states that judges "shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Accordingly, Tenn. Sup. Ct. R. 10, Canon 3(E)(1) admonishes that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned."
> Disqualification decisions are discretionary ones. ***Bean v. Bailey***, 280 S.W.3d at 805; ***Bd. of Prof'l Responsibility v. Slavin***, 145 S.W.3d 538, 546 (Tenn. 2004). They do not, however, rest solely on a judge's own subjective perception of his or her ability to act fairly and impartially. ***Kinard v. Kinard***, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998); ***Collier v. Griffith***, No. 01A01-9109-CV-00339, 1992 WL 44893, at *5 (Tenn. Ct. App. Mar. 11, 1992) (No Tenn. R. App. P. 11 application filed.) Rather, a more objective standard must

be used. ***State v. Cannon***, 254 S.W.3d 287, 307 (Tenn. 2008); ***Davis v. Liberty Mut. Ins. Co.***, 38 S.W.3d 560, 564-65 (Tenn. 2001). The objective standard consistently used by Tennessee's courts is that recusal is warranted only "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." ***Davis v. Liberty Mut. Ins. Co.***, 38 S.W.3d at 564-65 (quoting ***Alley v. State***, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994); *see also **Bean v. Bailey***, 280 S.W.3d at 805; ***State v. Cannon***, 254 S.W.3d at 307.

*In re: Hooker*, No. M2009-01498-SC-OT-CV, ___ S.W.3d ____, 2011 WL 669267, at *4-5 (Tenn. 2011). ***See also State v. Odom***, 336 S.W.3d 541, 575 (Tenn. 2011); ***Beard v. Bd. of Prof. Resp.***, 288 S.W.3d 838, 860-61 (Tenn. 2009). The Court has emphasized the objective portion of the test for recusal, noting that even if the judge subjectively believes he can be impartial, he should nevertheless disqualify himself when his impartiality might reasonably be questioned because "the appearance of bias is as injurious to the integrity of the judicial system as actual bias." ***Bean v. Bailey***, 280 S.W.3d 798, 805 (Tenn. 2009) (quoting TENN. SUP. CT. R. 10, Canon 3(E)(1)).

Thus, in deciding on a motion for recusal, a judge must first subjectively determine whether he can be fair and impartial in the case. If not, he must recuse himself. If the judge determines subjectively that he can be impartial, he must then go on to consider objectively whether there is an appearance of bias or prejudice, that is, whether his "impartiality might reasonably be questioned." TENN. SUP. CT. RULE 10, Canon 3(E)(1) (commentary). If so, he must recuse himself, even if he has already found subjectively that he can be impartial.

In this case, Wife does not draw the Court's attention to anything in the record indicating that Chancellor Ellis exhibited bias or prejudice in the proceedings below, nor have we seen anything in the record indicating actual bias or prejudice. Wife relies solely on the objective prong of the test for recusal, arguing that a significant portion of the basis for Chancellor Ellis's initial recusal remained, which objectively is a situation in which Chancellor Ellis's "impartiality might reasonably be questioned."

In the initial divorce proceedings, Chancellor Ellis *sua sponte* recused himself based in part on Husband's employment as Director of the AOC, stating that this would create "a perception of conflict due to the fact that [Husband] controls all the administration of my office and every judge's office in Tennessee." Husband rightly notes that this reason no longer exists.

-11-

However, in his letter of recusal, Chancellor Ellis stated as the first of his two bases for recusal: "One, my wife and I are personal friends with the parties." In contrast to the second reason related to Husband's employment, Chancellor Ellis's letter does not indicate that the personal friendship would create "a perception of conflict." Therefore, it is unclear whether this reason related to a subjective determination of partiality or an objective determination that his impartiality could reasonably be questioned.

In Chancellor Ellis's February 2010 order on Wife's disqualification motion, he finds that he "can be fair and impartial to both parties in this case." Regarding the personal relationship with the parties, the order states: "[A]lthough Chancellor George R. Ellis is personally acquainted with the parties, . . . Chancellor Ellis has not socialized in the homes of the parties, nor have the parties socialized in the home of Chancellor Ellis." The order further observes that "one of the difficulties of serving on the rural bench for more than thirty years is that the Court will sometimes know the parties . . . , but that fact in and of itself is insufficient to demand recusal."

We agree fully with the trial court's wise observation that judges in rural areas sometimes know the parties who appear before the court, and may even share a friendship with them, but this fact alone does not mandate recusal. Had Chancellor Ellis given this reason for declining to recuse himself in the initial divorce proceedings, there would be no reason to appeal. In this case, however, that same friendship with the same parties impelled Chancellor Ellis, *sua sponte*, to recuse himself in the initial divorce proceedings. In the February 2010 order, Chancellor Ellis does not explain how the situation changed during the intervening years, or whether the relationship that led to recusal in 2006 no longer caused actual bias, or whether it no longer created an appearance of partiality. Based on the record before us, there is no basis for this Court to find objectively "that the passage of time removes the appearance of bias and prejudice." *Bean*, 280 S.W.3d at 806.

We note that, in the course of considering this appeal, this Court has thoroughly reviewed the record and the substantive issues raised on appeal by the parties. It is apparent from the record that Chancellor Ellis handled the proceedings below with utmost propriety and evenhandedness. Moreover, from our review of the evidence, it is difficult to see how another trial judge could reasonably reach a result different from the result reached by Chancellor Ellis.

However, our Supreme Court has emphasized that "[t]he right to a fair trial before an impartial tribunal is a fundamental constitutional right." *Odom*, 336 S.W.3d at 575 (quoting *Slavin*, 145 S.W.3d at 548); *see also Bean*, 280 S.W.3d at 803 (quoting *State v. Austin*, 87 S.W.3d 447, 470 (Tenn. 2002)). Therefore, we are loathe to conclude that Chancellor Ellis's

denial of the motion to disqualify was harmless error, even where the evidence points so clearly to the decision he made.

We must reluctantly conclude that the trial court erred in denying Wife's motion to disqualify. Therefore, we must reverse the trial court's denial of the motion to disqualify. This holding makes it necessary for us to vacate the trial court's order granting Husband's petition to terminate alimony and denying Wife's cross-petition to increase alimony. The cause must be remanded with directions to have the case assigned to a different trial judge.

However, in light of our review of the evidence presented to Chancellor Ellis below, we suspend Husband's obligation to pay Wife alimony *in futuro*, pending resolution of the parties' cross-petitions by a new trial judge. All other issues raised on appeal are pretermitted.

## CONCLUSION

The decision of the trial court is reversed in part, vacated in part, and remanded for further proceedings, with directions to have the cause assigned to a different trial judge. Appellee Randy Coleman Camp's obligation to pay alimony *in futuro* to Appellant Lisa Faye Roland Camp is ordered suspended, pending a final order by the transferee trial judge. Costs of this appeal are taxed one-half to Appellant Lisa Faye Roland Camp and her surety, and one-half to Appellee Randy Coleman Camp, for which execution may issue if necessary.

_____

HOLLY M. KIRBY, JUDGE