# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 19, 2012

## STATE OF TENNESSEE v. CHRISTOPHER SCOTT CHAPMAN

**Direct Appeal from the Criminal Court for Sumner County**
**No. 2008CR833     Dee David Gay, Judge**

_____

### No. M2011-01670-CCA-R3-CD - Filed March 13, 2013

_____

Defendant, Christopher Scott Chapman, was indicted by the Sumner County Grand Jury for attempted first degree murder and possession of a firearm during the commission of a dangerous felony. Following a jury trial, Defendant was convicted of aggravated assault, charged to the jury as a lesser included offense of attempted first degree murder, and the second count of the indictment was dismissed by the trial court. Defendant was sentenced by the trial court to serve six years in the Tennessee Department of Correction. Defendant appeals his conviction and sentence and asserts: 1) that the trial court erred by instructing the jury as to the offense of aggravated assault as a lesser included offense of attempted first degree murder; 2) that the trial court erred by not recusing itself; 3) that the trial court erred by sentencing Defendant to the maximum sentence within the range; and 4) that the trial court erred by ordering Defendant's sentence to run consecutively to a prior sentence for aggravated assault for which Defendant was on probation at the time he committed the offense in this case. After a careful review of the record, we find no error and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Russell E. Edwards, Hendersonville, Tennessee, (on appeal), David R. Howard and David Michael Carter, Gallatin, Tennessee, (at trial), for the appellee, Christopher Scott Chapman.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; Tara Wyllie, Assistant District Attorney; C. Wayne Hyatt, Assistant District Attorney General; and Lytle Anthony James, Assistant District Attorney General, for the appellee, the State of Tennessee.

# OPINION

*Facts*

Sharon Markum Estes and Defendant met while they were in high school. They parted ways and later began dating. She testified that their "relationship had been up and down." On the morning of August 7, 2008, Defendant and Ms. Estes "both had things to do," and they left Ms. Estes' house. At approximately 4:00 p.m., Mrs. Estes went to Defendant's grandfather's house. She left there to go to her sister's house at approximately 5:30 p.m. She testified that when she left, things between Defendant and her were "pretty normal." Defendant had asked her to find some boxes for him to ship some items, but she did not find any boxes so she did not return to Defendant's grandfather's house that evening. She arrived home at approximately 8:30 p.m., and she spoke to Defendant on the phone at approximately 9:30 p.m. Defendant "was upset with [her]" because she had not returned with some boxes. She explained to Defendant that she did not find any and that "it was late, and [she] . . ., wanted to stay home." Defendant was angry, and he told Ms. Estes that he was going to come get his printer that he had let her borrow the previous day. She testified that Defendant threatened to end their relationship but that Defendant had made those threats before, and it was not unusual. She testified that she "wasn't really worried" about Defendant coming over to retrieve his printer.

Defendant arrived at Ms. Estes' house at approximately 10:00 p.m. She testified that he was "very angry." Defendant "grabbed a cup off the table and got a glass of wine" and "slammed" her VCR on the cabinet. Ms. Estes testified that she was frightened by Defendant's tone because he had "never used that tone with [her] ever." She testified that Defendant sounded "demonic." Defendant was following her through the house and "yelling and screaming and telling [her], [']why can't you do what I ask you to do[?']" She "grabbed [her] cell phone" and "bolted out the back door." Defendant chased her. Ms. Estes was dialing 911 when Defendant grabbed her by the hair and she "saw the gun in [her] face." She testified that Defendant had a revolver. Defendant put the gun to Ms. Estes' temple. Defendant told Ms. Estes, "[g]ive me the phone you [f]-ing [b]itch." She let go of the phone and pulled away from Defendant. She felt the gun "slip," and she heard a gunshot and "felt the blood spray [her] in the face." She fell to the ground and "jumped back up" and ran screaming. Defendant threatened Ms. Estes, "you better keep running you [f]-ing [b]. I'm going to kill you." She heard another gunshot as she ran towards the neighbor's house. She testified that she fell running through a hedgerow between her house and the neighbor's house. When she fell, Defendant was standing over her with the gun to her side. She testified that she was pleading with Defendant to "please, just stop," and she heard another gunshot. Defendant then went back around the bushes, and Ms. Estes ran to her neighbors' houses until someone let her inside and gave her help.

Dr. Michael Johnson, an attending physician in the Emergency Department at Vanderbilt Medical Center, treated Ms. Estes. He reviewed a CT scan and testified that Ms. Estes had bullet fragments and injuries in her shoulder and upper torso. On cross-examination, Dr. Johnson testified that Ms. Estes was brought by LifeFlight to Vanderbilt due to "penetrating trauma to the torso." Although Ms. Estes' wounds qualified her to be airlifted to the hospital, the wounds were not necessarily life threatening. Hospital records showed that Ms. Estes arrived at the hospital at 11:26 p.m. and was discharged approximately two hours later.

David Anderson, Defendant's grandfather, testified that in 2008, Defendant lived with him. Mr. Anderson owned a .38 caliber revolver. He testified that the first chamber that would fire was loaded with birdshot and the following chambers were loaded with .38 caliber bullets. Mr. Anderson discovered that the revolver was missing after the incident.

Robert Reese, the victim's neighbor, testified that on August 7, 2008, he heard a gunshot. He saw "a heavyset man with a ponytail" walk from his truck to the side of the house and back to his truck again. Mr. Reese testified that "[n]othing seemed to be out of the ordinary." He testified that the man "was very calm." Mr. Reese also testified that he heard a scream. He testified that he heard only one gunshot that night.

Kurt Hargrove lived beside Mr. Reese, two doors down from the victim's house. He testified that on August 7, 2008, at approximately 10:18 p.m., he heard "what sounded like three shots." He then heard "a loud knocking at the other end of the house." He testified that "there was knocking all around the house," and that his wife saw someone standing outside. He called the police, and when he looked outside, no one was there.

Mr. Hargrove's wife, Brenda Hargrove, testified that she walked outside through the back door and looked towards the victim's house. She saw a "white Dodge pickup truck with the taillights on and it went into reverse quickly because it threw gravel and as it turned to head out the driveway the [driver turned the] headlights . . . off." It was the same truck that had been at the victim's house "every day" previously.

Steven Carter lived three houses away from the victim. He testified that at approximately 10:00 p.m., he heard a noise outside. He looked out the window and saw the victim "banging on . . . the Hargroves['] door." The victim then ran toward Mr. Carter's house. He went to the front door and opened the door, and the victim "basically pried herself in and fell in the front door." Mr. Carter testified that the victim was "distraught, shaking, upset," and she "had blood on her." Mr. Carter brought the victim into his house, locked the doors, turned off the lights, and called 911.

Detective Dirk Witherow, of the Hendersonville Police Department, was called to the scene to investigate the shooting. Detective Witherow took photographs of the scene. He testified that he observed a trail of blood from the victim's house to the neighbors' houses. Detective Witherow interviewed the victim in the early morning hours on the night of the incident. He looked for the revolver used in the shooting but did not find it. He also testified that a shell casing had been found at the crime scene.

Doris Sandefur testified that she and Defendant's mother had been best friends since fifth grade and she had known Defendant since he was born. Ms. Sandefur saw Defendant on August 7, 2008, at 11:26 p.m. She testified that her husband answered a knock at the door, and she heard her husband say Defendant's name. Defendant came inside. Ms. Sandefur testified,

> And we started talking, I started talking to him. And he said, ["]Sharon and I got into a fight. I went down there to get my computer printer, we got in a fight and I shot at her.["] And he said, ["]I just – I didn't hit her. I didn't try to kill her. I just shot at her.["] [He s]aid, [" ] I think I nicked her on the ear[,"] and he pulled the gun out of his pocket and he said, ["]you can look at it and count the bullets.["] And I went, ["]I don't want to. Put it back.["] And I said, ["]we just don't want to be a part of this. I don't, you know, I think she's trouble and I don't want to be involved in it.["]

Defendant's mother, Karen Chapman, testified that in August, 2008, she lived across the street and four houses down from the victim. On August 7, 2008, Ms. Estes drove her riding lawnmower to Ms. Chapman's house for Ms. Chapman to use. Ms. Chapman testified that Ms. Estes told her that she had given Defendant a Xanax for his headache.

***Analysis***

*Jury Instructions*

Defendant asserts that the trial court erred by instructing the jury on the offense of aggravated assault because, Defendant argues, aggravated assault is not a lesser included offense of attempted first degree murder under *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999). The State concedes that aggravated assault is not a lesser included offense of attempted first degree murder. In *State v. Christopher Todd Brown*, No. M1999-00691-CCA-R3-CD, 2000 WL 262936, *2 (Tenn. Crim. App. at Nashville, filed March 9, 2000), *perm. app denied* (Tenn., Sept. 10, 2001), this court examined this issue and determined that "assault and aggravated assault are not lesser included offenses of attempted first degree murder." *See*

*also State v. Joshua Lee Williams*, No. W2000-01435-CCA-R3-CD, 2001 WL 721056, at \*6 (Tenn. Crim. App. at Jackson, filed June 27, 2001), *perm. app. denied* (Tenn., Oct. 29, 2001).

The State contends, however, that Defendant consented to an effective amendment of the indictment to include the offense of aggravated assault when he specifically requested a jury instruction on the offense. In *Demonbreun v. Bell*, 226 S.W.3d 321 (Tenn. 2007), the Tennessee Supreme Court determined that where the defendant "actively sought" an instruction on aggravated assault as a lesser included offense of attempted first degree murder, his actions constituted consent to an effective amendment of the indictment. *Id*. at 326. Here, Defendant filed a pretrial motion requesting a jury instruction on the offense of aggravated assault. The motion stated in part:

> That pursuant to established Tennessee law, the Defendant avers that, in addition to the jury charge of Attempted First Degree Murder, he is entitled to jury instructions as to all available lesser included offenses, [including] but not limited to: Attempted Second Degree Murder, Attempted Voluntary Manslaughter, Attempted Reckless Homicide, Attempted Criminally Negligent Homicide, and Aggravated Assault.

In a written order, the trial court granted Defendant's motion, but "specifically reserved the right to charge the Jury on those Lesser included Offenses believed relevant based upon the evidence presented at trial and, therefore, held [Defendant's request for specific jury instructions] under advisement until such time it could make a proper determination."

We conclude that the trial court properly instructed the jury as to the offense of aggravated assault based on Defendant's specific request for such instruction. By requesting the instruction, Defendant consented to an effective amendment of the indictment. Defendant is not entitled to relief on this issue.

*Recusal*

Defendant next asserts that the trial court should have recused itself from Defendant's case. Defendant cites several instances where he alleges the trial court showed personal prejudice against him.

At a pretrial hearing on November 19, 2009, one of Defendant's previous trial counsel (who was later allowed to withdraw) advised the court of disagreements between Defendant and himself over his representation of Defendant. He stated the following to the court:

[DEFENSE COUNSEL]:  The difficulty that I'm having at this point and the difficulty that we need to make the Court aware of, the difficulty that we need to put on the record is that I am tasked to zealously represent my client and to effectively represent my client. It is my belief that no lawyer walking the face of the earth can effectively represent a client who has already made his mind up about what can be done and what the outcome of a jury trial is going to be and who refuses to participate or listen to his counsel. He and I may differ –

[DEFENDANT]:  That's not true, Your Honor.

THE COURT:  Okay. Hold on a second.

[DEFENSE COUNSEL]:  It is my view that [Defendant] has a deep desire to control the situation, that [Defendant] is manipulative; that [Defendant] is belligerent; that [Defendant] is insulting to his counsel. That being said, I'm not asking the Court to relieve me at this time. I'm just merely making the Court aware that it's going to be very difficult for anyone to represent [Defendant] unless he has a change of heart.

THE COURT:  I understand.

The trial court then placed Defendant under oath and explained that it wanted "to be certain that all your constitutional rights are protected and I will do that as long as I live and breath." The trial court advised Defendant that he had "an obligation to work with any attorney that [the trial court] appointed" to represent him, and the trial court stated, "I'm getting concerned because this is the second attorney that I've appointed, the second attorney that's had problems." Defendant expressed his dissatisfaction with his attorney's services, stating that his representation was "about as ineffective as it gets." The following exchange then occurred:

-6-

| | |
|---|---|
| [THE COURT]: | Well, that's the same thing you said about [your former attorney]. Do you think the problem might be with you? |
| [DEFENDANT]: | Well, did you ever think – |
| [THE COURT]: | Did you ever think the problem might be with you? |
| [DEFENDANT]: | Well – |
| [THE COURT]: | Hold on just a second. You have and will reserve all your rights to appeal, and I will be sure that all your rights are preserved for you. My order is that you cooperate with Mr. Sindle; that you-all prepare for your trial; that you be cooperative and that you be respectful. |
| [DEFENDANT]: | I have a question for you, Your Honor. |
| [THE COURT]: | No. |
| [DEFENDANT]: | Okay. Well, I – |
| [THE COURT]: | No. |
| [DEFENDANT]: | – I'm going to ask it anyway. |
| THE COURT: | Well, get him out – hold on just a second – hold on just a second. Get him out of court. |
| DEFENDANT: | How is it effectual – |
| THE COURT: | Get him out of court. |
| DEFENDANT: | How is it ethical to bring a state's witness to my meeting with my lawyer? How ethical is that? It's not ethical. That's fine. |

(Defendant is escorted out of the courtroom.)

-7-

| | |
|---|---|
| THE COURT: | [Defense counsel], I don't know how you cannot get along with him. |
| [DEFENSE COUNSEL]: | Judge, I thank you for the Court's indulgence. I think now the record will reflect the attitude of [Defendant], and I will continue to meet with him and try to prepare – |
| THE COURT: | That's all you can do. |
| [DEFENSE COUNSEL]: | I do want to make the Court aware of the situation that even though I go down and even though I attempt to meet with him, whatever I say, just as demonstrated by [Defendant], will be manipulated to attempt to place responsibility for his problems on someone other than himself. |
| THE COURT: | I understand.  I understand. |
| [DEFENSE COUNSEL]: | And until – I want this on the record. Until [Defendant] grows out of his boyhood, until he becomes a man and starts accepting responsibility for the consequences of his actions, he will always be before this or another court. |
| THE COURT: | And that's unfortunate, . . . . That's kind of the thing that we see here all the time, and that's why we're here, to protect people from this type of conduct. |

At another hearing on December 17, 2009, the trial court began the proceeding by stating, "We're back out here again.  It looks like we've got the same problem we had the last time we were in."  The trial court read a letter written by Defendant to his trial counsel, and Defendant again expressed his dissatisfaction with his counsel's representation, complaining that counsel was "talking to various people not even associated with [his] case."  Defendant indicated that he had filed complaints against his counsel with the Board of Professional Responsibility, and the trial court found that it created "an unavoidable conflict" and appointed new counsel to represent Defendant.  The trial court commented, "[w]hat the

problem is, is the relationship with you and your attorney in preparation for trial and so forth. That's the problem . . . It looks like you're the one that's having a problem because this is the third attorney that I've appointed for you."

At a hearing on May 10, 2010, the trial court considered various pretrial motions, including the State's motion to transfer Defendant to the Tennessee Department of Corrections from the Sumner County Jail. At the hearing, Sonya Troutt, the jail administrator at the Sumner County Jail, testified about Defendant's conduct at the jail as follows:

> Throwing trays through the pie hold, becoming irate and belligerent in the attorney-client booth with his attorney, making verbal threats towards officers. Most recently, he had – one of my newer officers who happened to be a seasoned police officer at one time, had an altercation where he would not obey verbal commands. Hands-on was necessary.
>
> And he also has taken some type of offense toward our medical contractors, who is Southern Health Partners, to the point that when he's asked to come to medical, he will either lag and say he's thinking about it or he becomes disrespectful with the officers.
>
> He seems – like I said, this has progressed in the last few months. And in my opinion I feel like that we've done everything we can to house him. I think he would better be served in another facility.

Several specific instances of Defendant's conduct as reflected in his jail file were also testified to. At the conclusion of the hearing, the trial court granted the State's motion and stated,

> [Defendant], I read here what you told your attorney, . . . . I consider [him] to be a very good, competent attorney. Nobody should have to put up with that baloney, and they have a difficult job, and your anger, your personality, your ability to – or your narcissism about you're the only one that means anything, it is requiring absolutely too much time and effort by our Sumner County Jail.
>
> You are a troublemaker. You say what you want to get what you want which is evidenced by today smiling, having a good time, taking it easy; everything is cool. And now when you talk about suing people, you talk about all this and all that, but when you come around to the issue today, now it's okay for you to sit in the Sumner County Jail.

Well, I'm not going to put up with this baloney. I'm not going to ask the Sumner County Jail to put up with this baloney. They've done everything they can to safely house you.

I find the record is absolutely overwhelming that the Sumner County Jail is insufficient for your safekeeping and you will be transferred to the Tennessee Department of Correction.

On November 10, 2010, Defendant filed a motion for recusal, and a hearing was conducted on November 22, 2010. The trial court explained that it had made rulings on Defendant's motions and taken the necessary steps to maintain order in the courtroom. The trial judge acknowledged that he had been "somewhat agitated" by Defendant, but stated that he did not recall what he had said to Defendant in previous hearings. The trial court continued:

I can tell you this, [Defendant], I don't know fact one about the facts of this particular case. I don't know anything. Maybe if it's been brought up here, but I don't know anything about the facts. I don't know anything about your history. I might have mentioned that in the proceedings before when they were brought up in evidence. But I tell you this, I'm not going to put up with any baloney and I'm not going to put up with any disrespect in this Court, and I'm not going to put up with any efforts to delay things.

Now, I'm sure that I was pretty passionate and pointed in what I've said, but I can't remember what I've said, but I'm not going to change one bit. And, secondly, there is no reason in this case why I can't sit and continue to be fair and impartial. Like I stated, I don't know anything about the facts of this case. I don't remember specifically your background. I do know we had to send you to the penitentiary and I do know that we had problems with attorneys and we've had maybe some potential problems with your attitude in court that I've had to address.

But, [Defendant], I'm a judge and that's what I've been called to do now and there's no reason why I can't put aside any rulings that I've made any emotions that I've made in the past or exhibited in the past and preside in this trial. There is absolutely no reason that I can't be fair and impartial in continuing to preside as judge in this trial and I respectfully deny the Motion to Recuse.

On December 28, 2010, Defendant filed a second motion for recusal, stating that he had filed a *pro se* civil action in federal court naming the trial court as one of the defendants. On the morning of the first day of trial, the trial court addressed the motion and denied it.

It is a basic tenet of our jurisprudence that "'[t]he right to a fair trial before an impartial tribunal is a fundamental constitutional right.'" *Bean v. Bailey*, 280 S.W.3d 798, 803 (Tenn. 2009) (quoting *State v. Austin*, 87 S.W.3d 447, 470 (Tenn. 2002)). A trial judge should recuse himself or herself whenever the judge has any doubt as to his or her ability to preside impartially or whenever his or her impartiality can reasonably be questioned. *Pannell v. State*, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001). This is an objective standard. *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). "Thus, while a trial judge should grant a recusal whenever the judge has any doubts about his or her ability to preside impartially, [citation omitted], recusal is also warranted when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Id*. The trial judge retains discretion over his or her recusal. *State v. Smith*, 906 S.W.2d 6, 11 (Tenn. Crim. App. 1995). Unless the evidence in the record indicates that the trial judge clearly abused his discretion by not disqualifying himself, this court will not interfere with his decision. *State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995).

Our review of the record in this case shows that the trial court did not abuse its discretion in denying Defendant's motions to recuse. On more than one occasion, the trial court emphasized its duty to protect Defendant's constitutional rights. While the trial court made some disparaging comments about Defendant's attitude and behavior in court and towards his attorneys and the jail staff, those comments do not warrant recusal in this case. None of the comments made by the trial judge suggest any prejudgment of the rights of Defendant. The trial judge's characterization of Defendant as "a menacing and destructive force" at the hearing on the State's motion to transfer Defendant from the Sumner County Jail is supported in the record by several instances of Defendant's unruly conduct.

We note that the filing of a lawsuit against the trial judge is normally insufficient to warrant recusal. *See State v. Parton*, 817 S.W.2d 28, 29–30 (Tenn. Crim. App. 1991). To hold otherwise would mean that a litigant could automatically disqualify a judge by the filing of a frivolous suit and would set a dangerous precedent inviting additional frivolous litigation, manipulation of the judicial system, and forum shopping. *State v. Michael W. Parsons*, W2010–02073–CCA–R3–CD, 2011 WL 6310456, at *23 (Tenn. Crim. App., at Jackson, Dec. 15, 2011), *perm. app. denied*, (Tenn., May 23, 2012).

We are unable to conclude that the trial court abused its discretion in denying Defendant's motion to recuse. Defendant is not entitled to relief on this issue.

*Sentencing*

Defendant asserts that the trial court erred by sentencing Defendant to the maximum sentence within the range for the convicted offense of aggravated assault and ordering his sentence in this case to run consecutively to a sentence Defendant was serving for a prior conviction.

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40–35–401 (2010), Sentencing Comm'n Comments; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

At the sentencing hearing, April Thomas, of the Tennessee Board of Probation and Parole, testified that she prepared the presentence report which was admitted into evidence. She testified that Defendant pleaded guilty to aggravated assault on August 26, 2005, and he was sentenced to serve four years, and the sentence was suspended and he was placed on probation. Therefore, Defendant was on probation for the prior offense at the time the offense in this case was committed. On cross-examination, Ms. Thomas testified that Defendant had been placed on minimum supervision probation.

The trial court also admitted into evidence judgments showing that Defendant had prior convictions for assault in 1992 with a sentence of 11 months and 29 days probation, which was later revoked and the sentence was ordered to be served, and two 1993 judgments for driving under the influence.

David Anderson, Defendant's grandfather, testified that Defendant lived with him prior to Defendant's arrest. Mr. Anderson was 91 years old at the time of the sentencing hearing. He testified that Defendant's responses to him had "always been respectful and correct, mild. And I do know Chris, when he gets pushed hard he reacts very hard."

Defendant gave an unsworn statement in allocution. He expressed regret and remorse over the incident and apologized to the victim and to his family for having caused them pain. Defendant also stated, "I know in my heart, and I know people out there know that I'm not the bad guy that everyone tries to paint me out to be." Defendant further stated:

You know, nobody realizes – nobody talks about, you know, that I helped my grandfather, or, you know, that I help my mom, or I took care of Sharon and paid her bills and took care of her kids, or help my uncle build his cabin. You know, running seven days a week working, helping everybody around me, maybe getting four hours of sleep a night. Everybody just wanted to paint this bad picture of me, but nobody ever brought up anything good I did.

At the conclusion of the sentencing hearing, the trial court stated that it had considered the evidence at trial and at the sentencing hearing, the presentence report, Defendant's statement to the court, and his potential for rehabilitation. The trial court found that "[t]here's no doubt that [Defendant] is remorseful[;]" however, the trial court expressed disappointment that Defendant had not explained "why things happened the way they did. The record does not show that."

The trial court determined that Defendant was a Range I standard offender convicted of a Class C felony offense, which carries a sentence of three to six years. The trial court found that Defendant had a previous history of criminal behavior, that he "had no hesitation about committing a crime when the risks to human [life was] high," and that he was on probation at the time he committed the offense in this case. The trial court considered "[t]he imposition of a sentence justly deserved in relation to the seriousness of the offense" and sentenced Defendant to six years, the maximum sentence within the applicable range. The trial court also ordered Defendant's sentence to run consecutively to the four-year sentence he was already serving.

On appeal, Defendant asserts that the enhancement factors considered by the trial court "were not enough here to justify sentencing the Defendant to the maximum length within his range" and that the trial court should have considered certain mitigating factors. Unless a trial court "wholly depart[s] from the 1989 Act, as amended in 2005[,]" misapplication of enhancement or mitigating factors does not invalidate a sentence. Thus, a maximum sentence within the appropriate range, in the total absence of any applicable enhancement factors, and even with the existence of applicable mitigating factors, should be upheld as long as there are reasons consistent with the statutory purposes and principles of sentencing. *Bise*, 380 S.W.3d at 706; *Carter*, 254 S.W.3d at 345–46 ("Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors.") In this case, the trial court sentenced Defendant to six years for his conviction for aggravated assault, a sentence consistent with the purposes and principles of sentencing and within the appropriate range. Furthermore, the record shows that the trial court stated its reasons for imposing the maximum sentence, followed the statutory sentencing procedure,

made findings of fact that are adequately supported in the record, and gave due considerations to the relevant sentencing principles. Based on our review, we conclude that the trial court did not abuse its discretion in ordering the maximum sentencing within the applicable range. Defendant is not entitled to relief on this issue.

Defendant also asserts that the trial court erred by ordering consecutive sentencing. The trial court stated its reasons for ordering Defendant's sentence to run consecutively to a prior sentence as follows:

> This is a very aggravated crime. It's a very aggravating in the sense of rehabilitation and putting somebody on probation that was on probation when this occurred. I'm going to run the six years at 30 percent consecutively to the four years at 30 percent in Davidson County because the defendant is sentenced today for an offense committed while on probation. That is the reason for my consecutive sentence.

Consecutive sentencing is governed by Tenn. Code Ann. § 40-35-115, which provides that the trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that "[t]he defendant is sentenced for an offense committed while on probation[.]" Tenn. Code Ann. § 40-35-115(b)(6). The trial court has the discretion to order consecutive sentencing if it finds that one or more of the required statutory criteria exist. *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). The presence of a single factor is enough to justify the imposition of consecutive sentences. *Id*. We conclude that the trial court properly ordered Defendant's sentence to run consecutively to his prior sentence. Defendant is not entitled to relief on this issue.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE