IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on September 11, 2018


## LEE A. BEAMAN v. KELLEY SPEER BEAMAN


**Appeal from the Circuit Court for Davidson County**
**No. 17D680     Philip E. Smith, Judge**

_____

### No. M2018-01651-COA-T10B-CV

_____

This is an interlocutory appeal as of right, pursuant to Rule 10B of the Rules of the Supreme Court of Tennessee, from the denial of a motion for judicial recusal filed by Kelley Speer Beaman ("Wife") in the parties' high profile divorce proceedings. Having reviewed the Petition for Recusal Appeal filed by Wife, together with the supplement to the Petition and the response in opposition to the Petition filed by Lee A. Beaman ("Husband"), we conclude that the Trial Judge should have granted the motion. The Trial Judge in this case conducted an independent investigation into the facts surrounding how and when Wife's Trial Brief came into the possession of the online media outlet known as *Scoop: Nashville*, and his comments on the record regarding the results of his investigation create an appearance of prejudice against Wife and her counsel that require the Trial Judge's recusal. We therefore reverse the order of the Trial Court and remand the case for reassignment to a different judge.


**Tenn. Sup. Ct. R. 10B Interlocutory Appeal as of Right;**
**Judgment of the Circuit Court Reversed; Case Remanded for Further Proceedings**


D. MICHAEL SWINEY, C.J., delivered the opinion of the Court, in which RICHARD H. DINKINS and W. NEAL MCBRAYER, JJ., joined.

Larry Hayes, Jr., Nashville, Tennessee, for the appellant, Kelley Speer Beaman.

Gregory D. Smith, Nashville, Tennessee, for the appellee, Lee A. Beaman.

# OPINION

## I. FACTS

The parties were married on June 15, 2001, after having dated for three (3) years and after an engagement of seven (7) weeks.[1] When they met, Wife was twenty-one (21) years old and Husband was forty-five (45) years old. Wife never had been married before her marriage to Husband. She had briefly attended college, but did not obtain a degree. Husband had been married three times before marrying Wife. He had two young daughters from a previous marriage at the time he met and began dating Wife. These children were nine (9) and seven (7) years old when the parties' married. The parties' only child was born in September 2005.

On June 7, 2001, just over a week before they married, the parties entered into an antenuptial agreement[2] which contained the following provisions governing the distribution of marital property between them if their marriage was dissolved by divorce:

> [Husband] shall pay to [Wife] cash in an amount equal to Sixteen Thousand Six Hundred Sixty-Seven Dollars ($16,667) multiplied by the whole number of months in which the Parties are married to each other; provided, however, with respect to the period the Parties are married to each other after June 2003, beginning July 1, 2003 the monthly amount for each 12 consecutive month period shall be increased annually by three percent (3%) of the monthly amount applicable to the prior 12 month period; provided, further, if the amount that [Husband] is to pay to [Wife] under this paragraph exceeds Two Million ($2,000,000), then [Husband] shall instead pay to [Wife] cash in the amount of One Million Dollars ($1,000,000) and use the balance otherwise payable to [Wife] under this paragraph to purchase an annuity payable to [Wife] for the remainder of her life. Any amount to be paid by [Husband] to [Wife] or for the purchase of an annuity shall be paid within five (5) days after entry of the final decree of divorce; and
>
> If the divorce proceeding is commenced after the Parties have been married to each other more than ten (10) years, [Husband] shall purchase, or pay for the construction of, a residence for [Wife]; provided, however, [Husband] shall not be obligated to contribute more than One Million

---

[1]A discussion of the procedural and factual background of this case is necessary to give context to the sole issue on appeal.

[2]Antenuptial agreements, sometimes referred to as prenuptial or premarital agreements, are favored under Tennessee law. *See Ellis v. Ellis*, No. E2013-02408-COA-R9-CV, 2014 WL 6662466, * 4 (Tenn. Ct. App. Nov. 25, 2014).

Dollars ($1,000,000) toward such purchase price or construction cost. [Wife] shall identify the residence to be acquired and [Husband] shall contribute his portion (not to exceed One Million Dollars ($1,000,000)) of the cost thereof within six (6) months after entry of the final decree of divorce.

(Internal paragraph numbering omitted.) The agreement further provided a general waiver by the parties of any alimony or spousal support if the marriage was dissolved by divorce, with the following relevant exceptions:

[Husband] shall provide [Wife] with the use of an automobile during the period in which the divorce proceeding is pending.
. . . .
If the Parties have been married to each other two (2) years or more on the date the divorce proceeding is commenced, then during any period in which the divorce proceeding is pending and the Parties are separated [Husband] shall pay to [Wife] alimony *pendente lite* of Ten Thousand Dollars ($10,000) per month; provided, however, such payments shall not be paid for an aggregate period in excess of the lesser of (i) the number of months the Parties are separated while a divorce proceeding is pending, or (ii) twelve (12) months.
[Husband] shall pay [Wife's] legal fees incurred in connection with the divorce, but in no event shall [Husband] pay fees in excess of Five Thousand Dollars ($5,000).

(Internal paragraph numbering omitted.)

On April 12, 2017, Husband filed a Complaint for Divorce seeking to dissolve the parties' marriage on grounds of "irreconcilable differences." The Complaint sought enforcement of the terms of the parties' antenuptial agreement as well as the establishment of a Permanent Parenting Plan to govern the residential schedule and financial support of the parties' minor child.

On June 22, 2017, after being advised by the parties that they were attempting to reconcile, the Trial Court entered an Agreed Order of Reconciliation. However, as a result of the parties' inability to reconcile successfully, the Trial Court entered an order on July 14, 2017, setting aside the Agreed Order of Reconciliation.

On August 14, 2017, Wife filed her Answer and Counter-Complaint to Husband's Complaint for Divorce. In this pleading, Wife not only sought dissolution of the parties' marriage on the additional ground of "inappropriate marital conduct," she also challenged

the validity and enforceability of the parties' antenuptial agreement. Wife further asserted that she had been the primary parent and caregiver for the parties' minor child throughout the marriage and, therefore, should be the child's primary residential parent. In his Answer to Wife's Counter-Complaint for Divorce, Husband denied fault. He then filed an Amended Complaint for Divorce on September 29, 2017, asserting "inappropriate marital conduct" by Wife as an additional ground for his prayer for divorce. Wife filed her Answer to Husband's Amended Complaint on November 28, 2017.

On November 13, 2017, Husband filed a Motion for Partial Summary Judgment seeking a determination that the antenuptial agreement was a valid and enforceable contract between the parties. Wife filed a response in opposition to the motion, and the Trial Court heard oral argument from the parties on the issue on March 5, 2018. In a lengthy order entered on April 17, 2018, the Trial Court granted Husband's motion, thereby upholding the validity of the parties' antenuptial agreement. Wife subsequently sought permission from the Trial Court to file an interlocutory appeal from the order upholding the validity of the antenuptial agreement, which the Trial Court denied by order entered on June 18, 2018.

On June 21, 2018, the Trial Court entered an order denying Husband's motion to waive mediation and immediately set the case for trial. The Trial Court instead directed the parties to attend a Judicial Settlement Conference with a Special Master on September 4, 2018, and further set the case for a three and one-half (3½) day trial to begin on September 10, 2018. At the time this order was entered, the parties already were scheduled to attend mediation on August 20, 2018.

On the same day the Trial Court entered its order setting the case for trial, Wife filed her first motion to continue the trial setting, or, in the alternative, to order Husband to attend a deposition on a date certain. In this motion, Wife recounted the difficulties she had encountered in scheduling Husband's deposition for a date certain prior to the parties' scheduled mediation. Wife later filed a supplement to this motion, on July 3, 2018, in which she sought, in addition to the relief already requested, to compel Husband to allow an appraiser access to all personal marital property to be divided between the parties. The Trial Court entered an order on July 23, 2018, denying Wife's request for a continuance but granting Wife's request to compel Husband to grant her appraiser access to the parties' personal marital property for purposes of valuation. However, despite Wife's ability finally to schedule Husband's deposition to take place on August 2, 2018, she later sought another continuance of the trial setting. This continuance request was based upon Husband's failure to comply with other written discovery requests and personal property appraisals. Husband asserted his refusal was due to the parties' Agreed Protective Order, over which there had arisen a dispute, having not yet been entered by the Trial Court.

By order entered on August 9, 2018, the Trial Court denied Wife's second request to continue the trial setting, but indicated that a Protective Order would be immediately forthcoming. The Trial Court further ordered that it would "leave open the proof at the conclusion of the trial of this cause for additional discovery related solely to untitled personal property and valuation of untitled personal property" should same be determined to be necessary.

After mediation failed, the parties found themselves in yet another dispute over the scheduling of their depositions. As a result of that dispute, on August 30, 2018, Wife filed a motion to quash Husband's August 27, 2018 notice attempting to schedule her deposition to take place on the afternoon of August 30, 2018. After Wife refused to be deposed on the afternoon of August 30, 2018, Husband filed a motion on the day of the parties' scheduled Judicial Settlement Conference (September 4, 2018) seeking to compel Wife to sit for a deposition that afternoon immediately following the Conference. By order entered on September 7, 2018, the Trial Court granted Husband's motion and ordered Wife to appear and sit for a deposition on Saturday, September 8, 2018.

Meanwhile, on the morning of September 5, 2018, the Special Master sent an email to counsel for both parties which stated, in pertinent part, as follows:

> I am writing to inform you that the Judge would like you to prepare a joint statement of issues for the trial next week. He'd also like for the statement to contain any agreements that you may have but mostly, he is looking to see exactly what the issues are that will be presented at the trial. He will likely prepare for this case over the weekend so, if you can provide this to our office by noon on Friday 9/7 that would be great. Please let me know if you have any questions.

This email was sent by the Special Master at 9:31 a.m. on the morning of September 5, 2018. Late that afternoon, counsel for Husband filed his Pretrial Brief. Counsel for Wife filed her Trial Brief the following afternoon. The file stamp on the copy of Husband's Pretrial Brief that accompanied his response to the Petition for Recusal Appeal in this Court indicates that it was filed originally with the Trial Court Clerk by facsimile transmission at 4:24 p.m. on September 5, 2018. The file stamp on the copy of Wife's Trial Brief that accompanied her Petition for Recusal Appeal in this Court indicates that it was filed originally with the Trial Court Clerk at 3:43 p.m. on September 6, 2018.

At 8:43 a.m. on September 7, 2018, Husband filed a motion to strike Wife's Trial Brief. As grounds for the motion, Husband alleged that Wife's Trial Brief contained "immaterial, impertinent and scandalous matter only meant to harass [Husband]" and that

5

its contents had "little to no relevance on the issues" to be determined at trial. The motion further asserted that Wife's Trial Brief had failed to comply with section D of the Trial Court's Chambers Rules in that it was not filed "at least 72 hours prior to" the scheduled final hearing in this case, excluding weekends and holidays as required by the referenced rule.

At 10:13 a.m. on September 7, 2018, Wife filed her response in opposition to Husband's motion to strike her Trial Brief. Wife argued first that the allegations contained in her Trial Brief were germane to the issues of fault and custody in this proceeding. Specifically, she alleged that she intended "to prove the allegations set forth in her Trial Brief" to support both her contention that "Husband's conduct, not hers, was the cause of the demise of this marriage," and that "she should be named the minor child's custodian/residential parent." Wife next argued, based upon the email received from the Special Master, that she delayed in filing her Trial Brief because she "was under the impression" that, despite the Local Chambers Rules, the Trial Court would accept pretrial briefs by noon on Friday, September 7, 2018, if counsel could not agree on the joint statement referenced in the email. Wife also argued that Husband's position on the tardiness of Wife's Trial Brief was disingenuous because Husband's Pretrial Brief, filed as it was at 4:24 p.m. on September 5, 2018, also was filed in violation of the Local Chambers Rules. Specifically, Wife pointed out that "72 hours prior to the beginning of trial is 9:00 a.m. on Wednesday, September 5, 2018 since this trial is set to begin at 9:00 a.m. on Monday, September 10, 2018."

A hearing on Husband's motion to strike Wife's Trial Brief was held on the morning of Saturday, September 8, 2018. During his argument on the motion, counsel for Husband made reference in the following remarks to the fact that this case, and in particular, Wife's Trial Brief, had garnered some media attention:

> I don't know if the Court has been following social media, following the news, following Facebook, but [Wife] filed on Wednesday, the 5[th] --- I'm sorry --- filed her trial brief on Thursday, which was a late-filed brief anyway which was three days before the trial. . . .
>
> It is not necessary to spread what we consider to be falsehoods on a public record, nor is it necessary to do what we believe happened here. And that was not what the point was with this filed with the Court and made public record. We think it was also provided to the media.
>
> I've had calls from reporters. I haven't responded to any of them. But we've had people asking us in emails and other things about some matters that weren't in the pretrial brief but were in her answers to discovery.

6

At that point, the Trial Judge remarked:

> My thought is clearly this was scandalous. There's no way around addressing it. These issues [of grounds for divorce] could have been addressed without it.
> But be that as it may, my concern is we've got a child out there that's going to read this.

Counsel for Husband interrupted to state that he had not "gotten to that yet," to which the Trial Judge responded:

> I'm going to cut you off.
> Now, I believe and if I find [Wife] has or anyone on her behalf has provided this to the media, that's going to go a long way in my deciding the relationship of the child between the child and [Husband]. Because under [Tennessee Code Annotated section] 36-6-106, one of the things, one of the big factors that I look at is promotion of the relationship of the minor child with the other parent.
> Now, I'm going to ask everybody in this courtroom under oath in a minute if they've leaked it, gave it to the press, or in any way had anything to do with it being handed to the press.
> Now with that said, I've had a discussion with the Clerk's Office regarding the file stamp copies. And it was my clerk[.] He did the investigation and came back with the results. He will testify Monday, if necessary. But there were two copies. There were two --- there was an original and a copy that was submitted to the Court to the Clerk's Office a minute apart. Probably just a few seconds, but it rolled over. And both were issued by Bill Riggs, who was the clerk that accepted the copy. The original was taken, the copy was given.
> Now, if you look at what was produced on social media, there is a blue stamp. Anything on CaseLink is black and white. That is the second copy that was given Mr. Riggs that he initialed, the second copy. Now, Mr. Riggs assures the clerk that he didn't do anything with it other than what was in the regular course.
> Now, at this point in time, I'm going to ask everybody to rise, even the lawyers, and I'm going to ask them to raise their right hands.

All attorneys and both parties were then sworn. Upon questioning by the Trial Judge, both Husband and his attorneys denied having had any discussions with the media or having provided any copies to the media presumably of pleadings or other documents filed in this case.

When the Trial Judge turned to questioning Wife's counsel, her attorney objected to being placed under oath and being made a witness to the proceeding. The Trial Judge overruled the objection by stating: "Well, you're a witness. So answer the question." At that point, counsel for Wife stated that he had been contacted by "someone" at *Scoop: Nashville* after Wife's Trial Brief had been filed and that he (counsel) had advised this individual that "it had been filed." Counsel for Wife further stated:

> He asked me for a copy and I provided him a copy of what had been filed already.
> And so I have been contacted a number of times by different social media, different media, the Tennessean, and I refused to comment. And I refused to comment to Mr. --- he asked me for a comment, whoever it was. I think Mr. [Steen]. I said I can't comment. But I did provide him a copy of what I had filed, yes, Your Honor, and that is the extent of my involvement with the media.

The Trial Judge concluded the hearing by announcing that he would not be striking Wife's Trial Brief. The Trial Judge explained:

> It's out there. That's like putting the horse back in the barn. I will tell you I think it was disgusting. I think it was done to gain an advantage. And I think it was completely, in my opinion, unethical for that to be provided.
> Now, I will be looking at that as it relates to the relationship of this child with [Husband] and [Wife's] promotion of that relationship. Okay? Now, I've ruled on that.

In the written order memorializing this ruling, entered on the afternoon of September 8, 2018, the Trial Judge summarized Husband's motion to strike and the substance of the hearing that day as follows:

> [Husband] seeks the exclusion of [Wife's] trial brief on the bases that it contains immaterial, impertinent and scandalous matter meant to harass [Husband], and that it was filed outside the time-frame permitted by the Local Rules of the Court for the 20[th] Judicial District. [Wife] responds that the allegations contained in her trial brief are relevant to the issues of fault and custody of the parties' minor child, and that [Husband's] trial brief also was filed outside the appropriate time-frame.
> During the hearing of this motion, and in response to statements of [Husband's] counsel, the Court stated that it was aware [Wife's] trial brief had been "leaked" to the media, and had been posted to a website and

8

circulated on social media. The Court placed both parties and their attorneys under oath and asked each of them whether they had anything to do with the trial brief's release to the media. Larry Hayes, counsel for [Wife], admitted that a reporter from *Scoop: Nashville* contacted him on Thursday afternoon, September 6, 2018, to ask whether a brief had been filed. Mr. Hayes further admitted that he advised the reporter a brief had been filed and that Mr. Hayes provided a file-stamped copy of the brief to the reporter. The Court finds such conduct to be distasteful and, possibly, unethical.

This Court recognizes that court filings are public documents, and is hesitant to strike any pleading or paper once it has been filed. Once upon a time, the fact that court filings were public documents simply meant that anyone could physically travel to the courthouse to view or copy a document. Perhaps the document, or portions of it, may have been published in the newspaper only to be thrown away when next day's edition arrived. Today such documents are easily circulated on the internet which, as we should well be aware, is "forever." [Wife's] trial brief mentions the parties' child by name. He is 13 years old. The Court can imagine the parties are embarrassed by the scandalous and salacious allegations contained in [Wife's] trial brief. The Court cannot imagine the effect such a public airing of his parents' dirty laundry will have on the parties' child. Nor can the Court adequately express its profound disappointment that [Wife's] trial brief will forever remain available for viewing by the parties' child at the touch of a few keystrokes. With all of that said, the Court regrettably must find that "the cat is out of the bag" and striking [Wife's] trial brief would have no material effect in undoing the harm that has been done by Mr. Hayes' "leak" to the media. . . .

Based upon these findings, the Trial Judge denied Husband's motion to strike Wife's Trial Brief.

At 8:54 a.m. on the morning trial was set to begin (September 10, 2018), Wife filed a motion to disqualify the Trial Judge from further presiding over this case, and to stay all proceedings pending the Trial Judge's ruling on the motion. Wife asserted that the Trial Judge's impartiality had been "called into serious question" as a result of the Trial Judge "(1) conducting an inappropriate independent investigation prohibited by the Code of Judicial Conduct, (2) making unequivocal statements that the results of [his] inappropriate independent investigation were going to heavily influence [his] deciding a central issue in this divorce and (3) making unfounded accusations and conclusions of unethical behavior [on the part of] Wife's counsel of record in the wake of said inappropriate independent investigation." Wife further alleged that she was now unable to

receive a fair and impartial hearing in this case as a result of the inappropriate independent investigation conducted by the Trial Judge. The motion stated that it was "not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless[ly] increase the cost of litigation."

In her motion, Wife recounted some of the procedural history of the case leading up to the hearing on Husband's motion to strike Wife's Trial Brief, as well as the comments made by the Trial Judge at that hearing. Wife explained that this case had "garnered the attention of the media" prior to the filing of Wife's Trial Brief, and supported that assertion by attaching to her motion a copy of an online article about the case published by *Scoop: Nashville* on June 4, 2018, on its website. Wife then explained in her motion:

> On the morning of Friday, September 7, 2018, the online media source [*Scoop: Nashville*], ran a second article on this case. In this second [*Scoop: Nashville*] article, a link was provided in the article by which someone could click on the link and be taken to another webpage to view a "Stamp-filed" copy of the entirety of Wife's Trial Brief that had been filed the previous day. . . .

Wife supported this assertion by attaching to her motion a copy of another online article published by *Scoop: Nashville* on September 7, 2018, on its website, which specifically referenced the filing and contents of Wife's Trial Brief. Wife asserted in her motion that the Trial Judge's remarks at the hearing on September 8, 2018, made clear that he "had already begun [his] own independent investigation and had apparently not only read the [second] [*Scoop: Nashville*] article, but had also 'clicked through' the link in the article to view the copy of Wife's Trial Brief that had been included with the article."

Wife's motion argued that the Trial Judge had violated Rule 2.9(C) of the Tennessee Code of Judicial Conduct by conducting an independent investigation into the facts surrounding how Wife's Trial Brief came to be in the hands of *Scoop: Nashville*, and that the Trial Judge had announced on the record that he had used the results of that investigation to influence his view of Wife's counsel's ethics and would use the results of that investigation when considering the issue of custody of the parties' minor child. In her motion, Wife asserted:

> There is absolutely nothing unethical about the fact that counsel for Wife granted a media outlet's specific request to provide them with a copy of a pleading that had already been filed in this case in preparation for a trial that was only a few days [away] and which was already the subject of media coverage.

10

Wife's motion then stated that "the exact sequence and timing of when and how Wife's Trial Brief came to be in the possession of the media outlet in question" was set forth in her counsel's unsworn declaration, which was attached to the motion. That declaration, which concluded with a certificate of service dated September 10, 2018, read in its entirety:

**LARRY HAYES, JR.** declares under penalty of perjury that the following is true and correct.

1. I am the attorney of record for the Defendant, Kelley Beaman in the above-styled divorce action.

2. On Wednesday, September 6, 2018 at approximately 3:42 p.m., I filed Wife's Trial Brief in preparation for the trial which was scheduled to begin on Monday, September 10, 2018.

3. A few minutes after 4:10 p.m. on September 6, 2018, I noticed that I had missed a call from Jason Steen at [*Scoop: Nashville*].[3]

4. Jason Steen was already listed in my phone as a contact because I had previously received a message from him [] several weeks earlier which indicated that he was writing an article about this case. Although I returned Mr. Steen's call on that occasion, I do not think we ever spoke and I do not believe he ever ran the article referenced in the message I had received.

5. At 4:14 p.m. on September 6, 2018, I returned Mr. Steen's missed call and spoke to Mr. Steen for approximately one (1) minute. I believe this to be the only time I have ever spoken to Mr. Steen in my life, and if I have had a previous conversation with him, I certainly do not recall it.

6. During my approximate one-minute phone call with him on September 6, 2018, Mr. Steen told me that he was writing an article about the Beaman divorce trial which was beginning on Monday, advised me that he had a copy of Mr. Beaman's Trial Brief, and asked me if I was going to file a Trial Brief on behalf of Mrs. Beaman.

7. In response to this question by Mr. Steen, I told him that I had already filed Mrs. Beaman's Trial Brief.

8. Mr. Steen at that point indicated that he had not seen a copy of Wife's Trial Brief on Caselink and therefore asked me if I could please provide him with a copy of what had been filed. I told Mr. Steen that I would do that.

---

[3]Verbiage referencing the copies of screenshots from counsel's cellphone showing the time of this and another missed call referenced in the above text has been omitted from this recitation.

9. Therefore, at approximately 4:16 p.m. on September 6, 2018, I emailed a "Stampfiled" copy of Wife's Trial Brief to Mr. Steen.[4]

10. At all times relevant to the facts stated in this Affidavit, I have been fully cognizant of the wording, restrictions, limitations, allowances and interpretations of Rule 3.6 of the Tennessee Rules of Professional Conduct. At no time during my representation of Mrs. Beaman or at any other time have I ever violated Rule 3.6 of the Tennessee Rules of Professional Conduct.

11. I take my ethical obligations very seriously. At the request of the Tennessee Supreme Court, I served two (2) separate three-year terms on the Board of Professional Responsibility Disciplinary Hearing Panel governing lawyer conduct and I was called upon numerous times to interpret and enforce the Rules of Professional Conduct against lawyers when necessary. I have been practicing law for 27 years and I have **never** been accused by any Court of any unethical behavior in my entire legal career. Further, I have never been found by any Court or any other governmental body, specifically the Board of Professional Responsibility, of committing any ethical violation in my entire career.

12. I take great offense to the manner in which this Court initiated an inappropriate independent investigation in which it forced me to testify over my objection and without prior notice about matters that resulted in this Court's erroneously concluding that "unethical" behavior had been undertaken by me in any way, shape, form or fashion.

13. If this Court were of the opinion or suspicion that any Rule of Professional Conduct had been violated, this Court is fully aware that the proper course of action would have been to refer this matter to the Board of Professional Responsibility which was created for that exact purpose, not to launch its own investigation, then conduct its own *sue* [sic] *sponte* hearing **without any notice** to the person(s) that this Court was actually investigating.

14. Regardless, the facts that this Court ultimately discovered though its inappropriate independent investigation **do not violate any Rule of Professional Conduct** and for this Court to make such a declaration in a public courtroom, then file an Order stating the same thing is offensive to me, unnecessary to the administration of this matter and is extremely prejudicial to my client's ability to receive a fair and impartial hearing which is a fundamental constitutional right.

15. This Court has made unfounded derogatory comments of the

---

[4]A copy of the email sent by Wife's counsel to Mr. Steen was attached to the declaration and showed that it contained no content other than the attachment.

most serious nature against me. I respectfully request that this Court recuse itself from further proceedings in this matter and that this Court consider striking or otherwise redacting from its Order entered September 8, 2018 any reference to "unethical" behavior on my part.

(Emphasis in original.) Wife argued in her motion that her attorney's conduct in providing *Scoop: Nashville* with a file-stamped copy of Wife's Trial Brief did not violate Rule 3.6 of the Tennessee Rules of Professional Conduct because "[t]he only thing that really happened in this matter is that counsel for Wife saved a media source a trip to the Courthouse to obtain a public document that it knew was there and that it wanted to read." Wife made the point in her motion that her attorney made no further comment to the media outlet regarding the Trial Brief, "which stands, as written, as an accurate summary of the relevant information and facts that counsel for Wife expects to be present at the trial of this cause."

A hearing on Wife's motion to disqualify the Trial Judge was conducted prior to the start of the trial on the morning of September 10, 2018. Wife's counsel announced that he had filed the motion that morning, to which the Trial Judge responded: "Well, what this does, Mr. Hayes, is it stays this case."[5] After counsel acknowledged that such was the case, the Trial Judge asked, after referencing counsel's prior attempts to continue the final hearing: "And now you don't think that looks a little funny?" Counsel answered in the negative, to which the Trial Judge responded: "You don't need to answer my question. I know what's going on here. Have a seat." Husband's counsel was then granted permission by the Trial Judge to respond to the motion, but provided no argument in opposition to the motion other than to state that Rule 10B's prohibition on a judge taking any further action in the case while a motion for judicial disqualification was pending included an exception "for good cause shown." The Trial Judge then stated that he would have a decision on the motion "before the end of the day."

At 4:48 p.m. on September 10, 2018, the Trial Judge entered a nineteen page order, with attachments, denying Wife's Rule 10B motion. After discussing the procedural history of this case, as well as the law governing judicial recusal, the Trial Judge determined subjectively that he was not actually biased or prejudiced in favor of or against either of the parties to this proceeding. The Trial Judge then embarked upon an analysis of whether "a person of ordinary prudence in the Court's position, with full knowledge of the facts known to the Court, would find a reasonable basis to question the Court's impartiality." The Trial Judge noted that he was "concerned about several issues

---

[5]We read the Trial Judge's remark as a reference to section 1.02 of Rule 10B of the Rules of the Supreme Court of Tennessee, which states: "While the motion is pending, the judge whose disqualification is sought shall make no further orders and take no further action on the case, except for good cause stated in the order in which such action is taken."

13

surrounding how and when the reporter [from *Scoop: Nashville*] received [Wife's] trial brief." The Trial Judge then acknowledged that he "became aware portions of [Wife's] trial brief had been posted on Twitter the afternoon of September 6, 2018."[6] The Trial Judge even attached to his order printouts of two posts from the Twitter account maintained by *Scoop: Nashville*, which posts made reference to Wife's Trial Brief, and which were time-stamped at 3:50 and 3:51 p.m. on September 6, 2018. From our review of the record, these printouts of the two posts are nowhere else in the record.

In determining that his actions in this case did not constitute an inappropriate independent investigation into the facts surrounding how *Scoop: Nashville* obtained Wife's Trial Brief, the Trial Judge provided the following explanation as to what transpired after he "became aware" that portions of the brief were on Twitter:

> At that time, the Court had not received a chambers copy of the trial brief and did not know that [Wife] had filed a trial brief. A member of the Court's staff checked Caselink to obtain a copy of [Wife's] trial brief. At that time, Caselink contained an entry indicating the brief had been filed, but the brief itself was not yet available for viewing. Because the trial brief was not yet available for viewing by the public, and because portions of the brief had been posted online so soon after the document had been filed, the Court's first concern was the possibility that someone in the Circuit Court Clerk's office had provided a copy of the document to the reporter. Given the salacious nature of the allegations contained in the brief, and with the parties' 13-year old child in mind, the Court contacted the Circuit Court Clerk ("the Clerk") to ask him to determine whether a member of his staff had provided a copy of the trial brief to a reporter and, if so, under what circumstances.
>
> As the Court noted in its September 8, 2018 Order denying [Husband's] motion to strike [Wife's] trial brief, the Court recognizes that court filings are public documents. They are available for viewing by anyone with a subscription to Caselink or the wherewithal to travel to the Clerk's office to obtain them. As far as the Court is concerned, however, there is a vast difference between a reporter traveling to the courthouse to

---

[6]Twitter is "self-described as an information network made up of 140-character messages called Tweets[,] . . . which may contain photos, videos, links and up to 140 characters of text." *In re Application of State for Commc'ns Data Warrants to obtain the Contents of Stored Commc'ns from Twitter, Inc.*, 154 A.3d 169, 170 n.1 (N.J. Super. Ct. App. Div. 2017) (internal quotations omitted). We note that Tennessee's Judicial Ethics Committee ("JEC") issued an advisory opinion in 2012, addressing "whether judges may utilize [online] social media" and, if so, "the extent to which they may participate." Tennessee Judicial Ethics Advisory Opinion, No. 12-01 (Oct. 23, 2012). The social media platform known as Twitter was specifically mentioned by the JEC in this advisory opinion. *See id.*

14

obtain a copy of a document and a member of either the Clerk's staff or the Court's staff advising a reporter that a document has been filed and providing a copy of that document to the reporter. The Court cannot --- and would not --- prevent a member of the media from doing his job. The Court could not condone, however, a member of the Clerk's staff or the Court's staff essentially doing the reporter's job for him. The Clerk investigated the matter and determined that a member of [Wife's] counsel's staff filed an original trial brief with the Clerk and, at the same time, obtained a "filed" stamp on a copy of the brief and retained the file-stamped copy. The Deputy Clerk who accepted the trial brief for filing assured the Clerk that he had done nothing with the original trial brief other than process it in accordance with the Clerk's regular business practices.

(Footnotes omitted.) Based upon the foregoing, the Trial Judge concluded that he was "well within [his] rights --- and, indeed, [his] responsibilities --- to determine whether inappropriate activity ha[d] taken place within the Court system that would prejudice either party in this, or any other, matter."

The Trial Judge then noted that, contrary to the apparent assertion made in Wife's recusal motion, it was Husband's counsel who indicated during the hearing on the motion to strike Wife's Trial Brief that he believed the brief had been provided to the media, and that the Trial Judge's subsequent actions at the hearing were in response to that assertion. The Trial Judge then used the Twitter post printouts attached to the order on review to refute Wife's counsel's assertions of fact as to the timing of his contact with the reporter from *Scoop: Nashville*:

> The Court notes that *Scoop: Nashville*'s first Twitter posts concerning [Wife's] trial brief were posted on September 6, 2018, at 3:50 and 3:51 p.m. The posts contained excerpts of the trial brief but, it appears, not the entire "file-stamped" document. While these posts were made after the brief was filed at 3:42 p.m., they were made well before Mr. Hayes, as he has declared under penalty of perjury in support of [Wife's] Motion to Disqualify, had spoken to the reporter and agreed to provide him with a copy of the trial brief.[7]
> Mr. Hayes takes umbrage with the Court's description of his conduct

[7]Husband, in a footnote in his response to Wife's Petition for Recusal Appeal, stated that, for purposes of this appeal, he would adopt Wife's counsel's statement "that the Brief was emailed to a member of the media at 4:16 p.m." Unfortunately, this does not change the fact that the Trial Judge found from his investigation that these Twitter posts "were made well before Mr. Hayes, as he has declared under penalty of perjury in support of [Wife's] Motion to Disqualify, had spoken to the reporter and agreed to provide him with a copy of the trial brief."

as "distasteful" and "possibly unethical." The Court is not concerned with whether or not Mr. Hayes may speak to the media concerning his client's divorce proceeding. The Court is concerned that Mr. Hayes thought nothing of providing a document containing salacious, as yet unproven allegations to the media, knowing full well that the parties have a 13 year old son who would, in all likelihood, have access to that document. The Court fully understands that all papers and pleadings filed with the Clerk are public documents. But given the nature of [Wife's] trial brief, and the age of the parties' child, it seems a matter of common decency that Mr. Hayes would rather make the reporter do the actual legwork of obtaining the brief himself. The brief was filed at 3:42 p.m. If, as Mr. Hayes has testified in his Declaration, he did not advise the reporter he had filed the brief until 4:14 p.m., it is possible the reporter would not have been able to make it [to] the Clerk's office in time to obtain a copy of the brief that afternoon. There would have been a nearly 17-hour period when the contents of the brief would not have been circulating online. But excerpts of the brief were posted online at 3:50 p.m. --- a mere eight minutes after its filing and well before it was available for viewing on Caselink. The reporter got the brief from somewhere. The Court does not know from where.

(Footnote omitted.)

The Trial Judge also rejected Wife's assertion that he had already determined to what extent the results of his alleged inappropriate investigation would bear on one of the central issues in this divorce proceeding. Specifically, the Trial Judge reasoned:

> The Court can only restate its utter dismay at the effect the publication of [Wife's] trial brief may have on the parties' child. The Court is not concerned with the contents of [Wife's] brief as they relate to the parties. The parties were adults, married to each other for 17 years, and their activities behind their closed bedroom door were entirely their business. The Court is very concerned that either party or their agents would actively participate in publishing the trial brief online, given the parties' child is 13 years old and would likely be reading the brief that very afternoon. Of course, the reporter easily could have obtained a copy of the trial brief himself and published it online the very next day. But he would have been doing his job and the parties' hands --- and consciences --- would have been clean.
>
> [Wife] alleges that the Court has determined one of the central issues in this divorce as a result of what has transpired regarding her trial brief. Nothing is further from the truth. The Court reinforced that each party's

16

demonstrated willingness and ability to promote their child's relationship with the other party is a factor the Court considers heavily when deciding custody issues. The Court further made the parties aware that if either of them provided [Wife's] trial brief to the media, such conduct would be relevant to that factor.

Aside from the validity of the parties' Prenuptial Agreement, nothing has been decided in this matter. But the Court is permitted to form opinions and make determinations concerning the parties and the issues as the case unfolds. . . .

. . .

The Court stated that it finds Mr. Hayes' providing a copy of [Wife's] trial brief to the media --- given the nature of the allegations it contains and the age of the parties' son --- to be "distasteful" and "possibly unethical." The Court stands by its statement. While the Court recognizes that Mr. Hayes may believe he is zealously advocating for his client, the Court also believes Mr. Hayes may fail to recognize that excessive zeal may be detrimental to his client's interests.

The Court does not know whether the allegations contained in [Wife's] trial brief are true. Quite frankly, their truth or falsity is irrelevant until the proof is heard by the Court. The Court's chief concern is the parties' child. . . .

Whether or not Mr. Hayes has violated any particular Rule of Professional Conduct would be an issue for the Tennessee Board of Professional Responsibility, not this Court. The Court is incredulous, however, that Mr. Hayes behaved in such a manner. As the Court noted in its September 8, 2018 Order concerning [Wife's] trial brief, items posted on the internet are "forever." It bears repeating --- the parties' child is 13 years old. He is old enough to access the internet and to read the posts made about his family. He is old enough to be hurt by what people in his community say about him and his family. He is young enough that he may not be able to separate the actions of the adults around him from his own feelings of self-worth. With the parties' child as its utmost concern, the Court does not apologize for its disappointment in Mr. Hayes' actions.

(Internal quotations, citations, and footnote omitted.)

The Trial Judge concluded his order by determining, contrary to the assertion made in the motion for judicial recusal, that the motion was, in fact, filed for the purpose of delay and with "an improper purpose." The Trial Judge explained:

[T]he Court must note that [Wife] has attempted to delay these proceedings

17

no fewer than four times prior to filing her Motion to Disqualify. The Court further notes that under the terms of the parties' prenuptial agreement, [Wife] stands to receive more money for each day she remains married to [Husband]. The Court cannot ignore that it is in [Wife's] financial interest to delay the trial of this matter as long as she possibly can. While she stated her Motion to Disqualify is not presented to cause unnecessary delay, the Court believes this to be yet one more attempt to delay the proceedings. . . .

Wife thereafter timely filed her Petition for Recusal Appeal in this Court pursuant to Rule 10B. The Petition was placed in the drop box maintained by the Appellate Court Clerk pursuant to Rule 20(a) of the Tennessee Rules of Appellate Procedure, at some point prior to the opening of the box on the morning of September 11, 2018. That same morning, the Trial Judge began the final hearing in the parties' case, and Wife filed with the Appellate Court Clerk a supplement to the Petition and motion seeking a stay of the trial court proceedings pending the outcome of this accelerated interlocutory appeal. The parties completed their opening statements and Husband testified for over an hour before a lunch break was taken. During the lunch break, this Court entered an order staying the trial court proceedings and, pursuant to section 2.05 of Rule 10B, directed counsel for Husband to file an answer to the Petition.

Having reviewed Wife's petition and supporting documents submitted with the petition, together with the supplement to the petition and Husband's answer, we conclude that additional briefing and oral argument are unnecessary. As such, we proceed to decide this appeal in accordance with sections 2.05 and 2.06 of Rule 10B.

## II. ISSUES

The only issue before the Court in this appeal is whether the Trial Judge erred in denying Wife's Rule 10B motion. *See Duke v. Duke*, 398 S.W.3d 665, 668 (Tenn. Ct. App. 2012). Husband asserts in his answer to Wife's Petition for Recusal Appeal that, before this Court may evaluate the merits of the Trial Judge's stated reasons for denying Wife's motion, we first must consider any procedural defects in Wife's motion filed in the Trial Court and her petition filed in this Court that might provide a basis for affirmance. While Husband's position would appear to comport with the *de novo* standard of review applicable to Rule 10B interlocutory appeals as of right, *see* Tenn. Sup. Ct. R. 10B, § 2.01; *see also Elseroad v. Cook*, 553 S.W.3d 460, 462 (Tenn. Ct. App. 2018); *Duke*, 398 S.W.3d at 668, it does not comport with the well-settled proposition that issues not raised at the trial level are considered waived on appeal. *See, e.g.*, *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983); *Cain-Swope v. Swope*, 523 S.W.3d 79, 94 (Tenn. Ct. App. 2016); *Moses v. Dirghangi*, 430 S.W.3d 371, 381 (Tenn. Ct. App. 2013); *Barnhill v. Barnhill*, 826 S.W.2d 443, 458 (Tenn. Ct. App. 1991). In

18

other words, Husband asks this Court to consider certain procedural defects in Wife's motion that he never raised in the Trial Court and that were never considered by the Trial Judge in denying Wife's motion. We note that both existing case law in Rule 10B appeals, s*ee Cisneros v. Miller*, No. M2016-02426-COA-T10B-CV, 2017 WL 113964, *2 (Tenn. Ct. App. Jan. 6, 2017); *In re Samuel P.*, No. W2016-01592-COA-T10B-CV, 2016 WL 4547543, *2 (Tenn. Ct. App. Aug. 31, 2016); *Childress v. United Parcel Service, Inc.*, No. W2016-00688-COA-T10B-CV, 2016 WL 3226316, *2-3 (Tenn. Ct. App. Jun. 3, 2016); *Elliott v. Elliot*, No. E2012-2448-COA-10B-CV, 2012 WL 5990268, *3-4 (Tenn. Ct. App. Nov. 30, 2012), as well as Rules 13(b) and 36(a) of the Tennessee Rules of Appellate Procedure, when considered together, *see Emory v. Memphis City Schools Bd. of Educ.*, 514 S.W.3d 129, 148-49 (Tenn. 2017); *In re Kaliyah S.*, 455 S.W.3d 533, 540 (Tenn. 2015), appear to give this Court considerable discretion to consider the procedural issues raised by Husband for the first time in this appeal.[8] As such, we will address Husband's procedural issues before evaluating the merits of the Trial Judge's stated reasons for denying Wife's motion.

### III. PROCEDURAL ANALYSIS

Husband argues first that Wife's Rule 10B motion was procedurally defective in that it was not accompanied by "an affidavit under oath or a declaration under penalty of perjury *on personal knowledge*" as required by the rule. Tenn. Sup. Ct. R. 10B, § 1.01 (emphasis added). Specifically, Husband asserts that the unsworn declaration from Wife's counsel that accompanied her motion did not expressly state that it was based "on personal knowledge" and that, for this reason alone, the Trial Judge could have denied the motion. While Husband is correct that the requirement of a supporting affidavit or declaration under penalty of perjury in compliance with the rule is mandatory and that the absence of such an affidavit or declaration would provide a basis on its own for affirming the denial of Wife's motion, *see, e.g.*, *Murray v. Miracle*, No. E2018-01530-COA-T10B-CV, 2018 WL 4520573, *2 (Tenn. Ct. App. Sept. 20, 2018); *Berg v. Berg*, No. M2018-01163-COA-T10B-CV, 2018 WL 3612845, *4 (Tenn. Ct. App. July 27, 2018); *Childress*, 2016 WL 3226316 at *3; *Elliott*, 2012 WL 5990268 at *3, we reject the notion that such an affidavit or declaration must contain the words "on personal knowledge" for this Court

---

[8]We should note that with the discretion to consider these procedural deficiencies raised by Husband for the first time in this appeal comes the concomitant discretion to waive the deficiencies in order to reach the merits of Wife's motion as considered by the Trial Judge. *See In re Adison P.*, No. W2015-00393-COA-T10B-CV, 2015 WL 1869456, *3 n.5 (Tenn. Ct. App. Apr. 21, 2015) (considering the substantive merit of recusal issue in Rule 10B appeal despite procedural deficiencies in motion filed in trial court that did not form the basis for denial of motion); *Watson v. City of Jackson*, 448 S.W.3d 919, 928 (Tenn. Ct. App. 2014) (considering the substantive merit of recusal issue in Rule 10B appeal despite procedural deficiencies in both the motion filed in the trial court and the petition for recusal appeal filed in Court of Appeals).

to conclude that its contents are so based. *See Shook v. Associates in Ear, Nose, Throat, Head & Neck Surgery*, No. 03A01-9309-CV-00307, 1994 WL 25853, \*2 (Tenn. Ct. App. Jan. 26, 1994). In *Shook*, the appellant argued that an affidavit in support of a motion for discretionary costs pursuant to Rule 54.04 of the Tennessee Rules of Civil Procedure that did not expressly state that the expenses sought to be recovered were "necessary and reasonable" (as the rule required such expenses to be) was insufficient due to that omission alone to support a finding that the eligible expenses sought were reasonable and necessary. *See id.* This Court determined that "such 'magic words' were not necessary" if a "fair interpretation" of the affidavit demonstrated substantial compliance with the requirements of the rule. *Id.* We conclude that the same holds true here. A fair interpretation of Wife's counsel's declaration in this case demonstrates that it was based on personal knowledge even though it did not expressly state that it was based "on personal knowledge." Unlike the affidavit at issue in *Berg*, the declaration in this case did not include qualifying language necessarily negating the conclusion that it was based on personal knowledge. *Cf. Berg*, 2018 WL 3612845, at \*3 (holding that an affidavit that included an oath attesting that the statements contained therein were "true to the best of [the affiant's] knowledge, information and belief" was insufficient to signify that it was based on personal knowledge and therefore insufficient to support a Rule 10B motion for recusal).

Husband next argues that the declaration filed by Wife's counsel in support of the Rule 10B motion also was fatally defective in that it was not dated in accordance with the requirements of Rule 72 of the Tennessee Rules of Civil Procedure. We reject this argument based on a plain reading of both Rule 72 and the declaration filed by Wife's counsel in this case. Rule 72 states:

> Whenever **these rules** require or permit an affidavit or sworn declaration, an unsworn declaration made under penalty of perjury may be filed in lieu of an affidavit or sworn declaration. Such declaration must be signed and dated by the declarant and must state in substantially the following form: "I declare (certify, verify or state) under penalty of perjury that the foregoing is true and correct."

(Emphasis added.) First, the requirement in Rule 10B that a motion seeking judicial recusal be accompanied by "an affidavit under oath or a declaration under penalty of perjury" is not a requirement of the Tennessee Rules of Civil Procedure such that any of the content requirements of Rule 72 for an unsworn declaration under penalty of perjury would be binding on an affidavit or declaration filed in support of a Rule 10B motion. Tenn. Sup. Ct. R. 10B, § 1.01. Second, even if the content requirements of Rule 72 were applicable to an unsworn declaration filed in support of a Rule 10B motion, we conclude that the dated certificate of service at the conclusion of the declaration in this

case was sufficient to comply with any requirement in Rule 72 that such a declaration be dated.

Husband finally argues that Wife's failure to challenge in this appeal the Trial Judge's finding in the order on review that Wife's Rule 10B motion was made for "an improper purpose," namely to "attempt to delay these proceedings," provides this Court with an independent unchallenged basis upon which to affirm the denial of the motion. Specifically, Husband argues that even if the Court determines that the Trial Judge's analysis on the "substance" of Wife's motion was in error, this Court should still affirm the denial of Wife's motion because she has failed to explicitly challenge the "improper purpose" finding in this appeal. However, contrary to Husband's attempt to compartmentalize the Trial Judge's findings in this case into two separate and distinct bases for the denial of Wife's motion, we feel that the Trial Judge's finding that Wife's motion was filed for "an improper purpose," despite the motion's assertion otherwise, was part and parcel of the Trial Judge's overall conclusion that his recusal was not required based on the allegations set forth in Wife's motion. In short, the Trial Judge's finding that Wife's motion was filed for "an improper purpose" was not a separate and distinct basis for the denial of the motion that must be separately, expressly, and explicitly challenged by Wife in this appeal.

## IV. MERITS ANALYSIS

Without question, "[t]he right to a fair trial before an impartial tribunal is a fundamental constitutional right." *Bean v. Bailey*, 280 S.W.3d 798, 803 (Tenn. 2009) (quoting *State v. Austin*, 87 S.W.3d 447, 470 (Tenn. 2002)). Article VI, section 11 of the Tennessee Constitution states,

> No Judge of the Supreme or Inferior Courts shall preside on the trial of any cause in the event of which he may be interested, or where either of the parties shall be connected with him by affinity or consanguinity, within such degrees as may be prescribed by law, or in which he may have been of counsel, or in which he may have presided in any inferior Court, except by consent of all the parties.

This constitutional right "is intended 'to guard against the prejudgment of the rights of litigants and to avoid situations in which the litigants might have cause to conclude that the court had reached a prejudged conclusion because of interest, partiality, or favor.' " *Id.* (quoting *Austin*, 87 S.W.3d at 470). By statute, the Legislature has delineated those circumstances in which recusal is constitutionally required. *See* Tenn. Code Ann. § 17-2-101.

In this case, recusal was sought by Wife on the basis that the Trial Judge had conducted an improper independent investigation into disputed issues of fact surrounding how and when *Scoop: Nashville* had obtained Wife's Trial Brief, thereby creating, at a minimum, the appearance of bias or prejudice on the part of the Trial Judge as evidenced by the conclusions reached by him as a result of his investigation. "[P]reservation of the public's confidence in judicial neutrality requires not only that the judge be impartial in fact, but also that the judge be perceived to be impartial." *Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998); *see also Offutt v. United States*, 348 U.S. 11, 14 (1954) (holding that "justice must satisfy the appearance of justice"). As such, Rule 2.11(A) of the Tennessee Code of Judicial Conduct as set forth in Rule 10 of the Rules of the Supreme Court of Tennessee requires a judge to recuse himself or herself "in any proceeding in which the judge's impartiality might reasonably be questioned." In other words, even when a judge subjectively believes that he or she can hear a case fairly and impartially, the judge still must recuse himself or herself " 'when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.' " *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564-65 (Tenn. 2001) (quoting *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994)); *see also Smith v. State*, 357 S.W.3d 322, 341 (Tenn. 2011) (quoting *Bean*, 280 S.W.3d at 805). This objective standard is necessary because "the appearance of bias is as injurious to the integrity of the judicial system as actual bias." *Davis*, 38 S.W.3d at 565; *see also Smith*, 357 S.W.3d at 340.

Husband centers his argument on the merits of this appeal on the contention that the Trial Judge in this case did not conduct an improper independent investigation into how and when *Scoop: Nashville* obtained Wife's Trial Brief. Husband asserts that the Trial Judge's inquiries in this regard were confined to consultations with court staff and court officials, and the questioning of the parties and counsel on the record, none of which are prohibited by the Tennessee Code of Judicial Conduct. We agree with Husband that, if the Trial Judge's inquiries were so confined, then no improper independent investigation occurred. Rule 2.9(C) of the Tennessee Code of Judicial Conduct states: "A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed." However, Rule 2.9(A)(3) expressly states that "[a] judge may consult with court staff and court officials whose functions are to aid the judge in carrying out the judge's adjudicative responsibilities," so long as the judge "makes reasonable efforts to avoid receiving factual information that is not part of the record, and does not abrogate the responsibility personally to decide the matter." Thus, the Trial Judge was correct in his conclusion that he was "well within [his] rights --- and indeed, [his] responsibilities" in consulting with the Circuit Court Clerk and his staff regarding the specifics surrounding when and how Wife's Trial Brief was filed. However, these inquiries, by the Trial Judge's own

22

admission as set forth in his order denying Wife's Rule 10B motion, came after the Trial Judge "became aware portions of [Wife's] trial brief had been posted on Twitter the afternoon of September 6, 2018."

The comments to Rule 2.9 of the Tennessee Code of Judicial Conduct make clear that "[t]he prohibition against a judge investigating the facts in a matter extends to information available in all mediums, including electronic." Tenn. Sup. Ct. R. 10, Rule 2.9, cmt. 6. As is clear from Wife's supplement to the Petition for Recusal Appeal filed in this Court, the printouts of the two posts from the Twitter account maintained by *Scoop: Nashville*, which were relied on by the Trial Judge in the order on review, and attached thereto, were never relied on or mentioned by the parties in the proceedings below, or attached to any pleading filed by the parties in the Trial Court. While emanating from the same media outlet as the online articles about the case that were attached to Wife's Rule 10B motion, it is clear from the uniform resource locator (URL), or web address, tags at the bottom of these respective documents that the articles attached to Wife's Rule 10B motion came from the website maintained by *Scoop: Nashville* while the documents attached to the order on review came from posts by *Scoop: Nashville* on its account maintained on the Twitter website. As such, it is clear beyond question that the Trial Judge in this case improperly consulted Twitter in an effort to resolve disputed facts surrounding how and when *Scoop: Nashville* obtained a copy of Wife's Trial Brief.[9]

Relying on *Holsclaw v. Ivy Hall Nursing Home, Inc.*, 530 S.W.3d 65 (Tenn. 2017), Husband correctly points out in his response to the Petition for Recusal Appeal that a determination that the Trial Judge in this case conducted an improper independent investigation in violation of Rule 2.9(C) does not automatically require the Trial Judge's recusal. We note that it is not the job of this Court to determine whether the Trial Judge's conduct was in violation of Rule 2.9(C). We instead consider that conduct only in determining whether the Trial Judge erred in not granting Wife's Rule 10B motion. As the Supreme Court made clear in *Holsclaw,* we must determine whether the Trial Judge's "impartiality might reasonably be questioned" as a result of the Trial Judge having conducted an independent investigation. *Id.* at 72. On this point, unlike the judge in *Holsclaw,* the Trial Judge in this case announced on the record and in his own orders that he had used the results of his independent investigation to influence his view of Wife's counsel's ethics and that he also would use the results of the investigation when

---

[9]Unfortunately, the Trial Judge's improper consideration of the time stamps on the Twitter posts he viewed during his independent investigation only served to create a factual dispute as to when Wife's Trial Brief came to be in the hands of *Scoop: Nashville*. This shows at least one reason why judges are prohibited from conducting their own independent investigations into factual matters including utilizing online sources not subject to the evidentiary standards of the adversarial process.

considering the issue of custody and parenting time of the parties' minor child. We are constrained to conclude that these comments by the Trial Judge create an appearance of bias or prejudice against Wife and her counsel that now require the Trial Judge's recusal. Nothing about the providing of a copy of Wife's Trial Brief to *Scoop: Nashville* violated the Tennessee Rules of Professional Conduct, as correctly alluded to by the Trial Judge in his comments on the record and orders in this case. *See* Tenn. Sup. Ct. R. 8, Rule 3.6(b)(2) of the Tennessee Rules of Professional Conduct (stating that a lawyer may convey to the media "information contained in a public record"). We agree with the Trial Judge in this case that "the willingness and ability" of a parent "to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child" is a statutory factor to be considered by a trial court in determining the issue of child custody in a divorce proceeding. *See* Tenn. Code Ann. § 36-6-106(2). However, we disagree that anything learned by the Trial Judge from his independent investigation into *Scoop: Nashville*'s posts should, in any way, color the Trial Judge's view of Wife with regard to this statutory factor.

## V. CONCLUSION

Accordingly, having determined that the record provided by Wife demonstrates that the Trial Judge erred in denying the motion seeking his recusal, we reverse and remand with directions that this case be assigned to a different judge in the 20th Judicial District. Costs on appeal are assessed against the appellee, Lee A. Beaman, for which execution may issue, if necessary.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

24